# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Morris*, 2013 IL App (1st) 110413

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANTONIO MORRIS, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-11-0413 |
| Filed | November 15, 2013 |
| Rehearing denied | December 11, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from defendant's conviction for first degree murder, the appellate court rejected defendant's contentions that the trial court erred in ruling that the State could use part of defendant's suppressed videotaped statement to impeach two medical experts he wanted to call on his behalf, that he was prevented from eliciting evidence that a statement of a participant in the murder was obtained in exchange for a plea to a lesser crime and a reduced sentence, that he was denied effective assistance of counsel, and that the trial court violated Supreme Court Rule 431(b), since, *inter alia*, the evidence of defendant's guilt rendered the ruling on his plan to call the medical experts on his behalf harmless, there was no evidence substantiating defendant's claim that the other participant's plea agreement was conditioned on his agreement to the factual basis the State presented and defendant forfeited the issue by failing to raise it at trial or in a posttrial motion, and the trial court's admonishments were substantially in accord with Rule 431(b). |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 06-CR-13757; the Hon. Thomas V. Gainer, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Michael J. Pelletier, Alan D. Goldberg, and Bryon M. Reina, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg and Peter D. Fischer, Assistant State's Attorneys, of counsel), for the People.

Panel

JUSTICE PALMER delivered the judgment of the court, with opinion.
Justices Howse and Taylor concurred in the judgment and opinion.

## OPINION

¶ 1 Following a jury trial, defendant Antonio Morris was found guilty of first degree murder based on a theory of accountability. Defendant was sentenced to a term of 30 years' imprisonment. On appeal, defendant contends that: (1) the trial court erred when it ruled that the State could use portions of defendant's suppressed videotaped statement to impeach two medical experts that defendant intended to call on his behalf; (2) he was denied a fair trial when the court prevented him from eliciting evidence that a prior statement of one of the participants in the crime, who testified at defendant's trial, was given in exchange for a plea to a lesser offense and a reduced sentence; (3) he received ineffective assistance of counsel; and (4) the court failed to properly admonish the potential jurors pursuant to Illinois Supreme Court Rule 431(b) (eff. May 1, 2007). For the reasons that follow, we affirm.

¶ 2 Defendant and three other men were arrested and charged with first degree murder arising out of the fatal beating of the victim, Phillip Thomas, in a vacant parking lot on the evening of May 8, 2006. Two of those men, Johnny Graves and Laronne Wallace, pled guilty to lesser offenses and testified at defendant's trial.[1] Defendant and the other man, codefendant Marcel Simpson, were tried together before a single jury.

¶ 3 Prior to trial, defendant filed a motion to suppress a videotaped statement he gave to police following his arrest. In that statement, defendant told police that he threw a metal pole at the decedent's back and hit him with it in the ribs. The trial court granted the motion and suppressed defendant's statement. The court noted that its ruling was based on a "technical violation of the *Miranda* warnings" and that there was no allegation that defendant's statement was coerced.

¶ 4 Prior to trial, defendant also filed a motion *in limine* asking the trial court to prohibit the State from introducing evidence of defendant's videotaped confession to police during trial.

---

[1]Graves pled guilty to conspiracy to commit murder in exchange for a 14-year prison sentence. Wallace pled guilty to second degree murder in exchange for a 17-year sentence.

Defendant stated that he would not be testifying at trial but that he intended to introduce "evidence from treating medical personnel at the Cook County jail that he was not able to physically commit the crime as alleged due to a medical condition, specifically his Hills-Sachs deformity as diagnosed by Cermak physicians." Defendant claimed that the testimony of these experts would be based on their own opinions and not on based on statements that defendant made in his confession. Defendant asked the court to preclude the State from introducing any details of his confession, including his statement that he threw a pipe at the victim.

¶ 5    Defendant submitted three documents to the trial court as an offer of proof in support of his motion *in limine*. The first was a medical intake form from the Cook County jail signed by a paramedic on May 16, 2006. In the document, there is a mark by the section for "Assistive Devices (prostesis, cane, etc.)" with the "etc." circled and the word "Brace" written in. In the remarks section it states "Hx. R. shoulder injury 4/06 Rx. Pain Pills and Brace." The next document was a Cook County radiology report regarding two X-rays taken of defendant's right shoulder on June 8, 2006. The document is signed by a "reading radiologist" named Oscar Jara. The report lists "Reason for Exam: Chronic Dislocation." The "Findings" section states that "[t]wo views of the right shoulder reveal[ ] no evidence of fracture or dislocation. There is flattening of the lateral aspect of the humeral head suggestive of Hill-Sachs deformity from previous dislocations." The final document was a definition of "Hill-Sachs deformity" taken from the Internet website biology-online.org, which defines "Hill-Sachs deformity" as "indentation or groove on posterolateral aspect of humeral head, probably due to compression of humeral head on posterior lip of glenoid, suggests repeated or chronic anterior shoulder dislocation, may occur after one episode of dislocation associated with: Bankhart lesion of glenoid." Biology Online, http://www.biology-online.org/dictionary/Hill-sachs_deformity (last visited Nov. 13, 2103).

¶ 6    The State responded by asking the court to deny defendant's motion and to allow it to play portions of defendant's videotaped statement to impeach defendant's proposed medical experts. The State pointed out that in his confession, defendant admitted to throwing a pipe at the victim and to hitting the victim in the back and rib cage with the pipe. The State argued that allowing it to introduce evidence of defendant's confession would further the State's "truth seeking function."

¶ 7    When arguing the motion before the trial court, defense counsel stated that the experts examined defendant and diagnosed him with Hill-Sachs deformity. Counsel argued that the testimony would be that defendant would "at least have a diminished capability for performing that (throwing or hitting the victim with a pole)." In response, the State argued that defendant wanted to call witnesses who would testify to things that defendant had told them about his physical condition and that it should be allowed to impeach those experts with portions of defendant's statement to rebut what amounted to "perjury by proxy." Defense counsel responded that although defendant made statements that he had a history of shoulder problems that were recently exacerbated, the doctors would testify to information they learned from "a physical observation of [defendant]" and that defendant did not "have a conversation with" the radiologist who read defendant's X-ray. The trial court agreed with the State and ruled that if defendant called the medical experts, the State would be allowed

to confront them with portions of defendant's videotaped statement.[2]

¶ 8 The following evidence was presented at trial.

¶ 9 Jesse Rucker, who was 74 years old at the time of trial, lived next to the vacant lot where the victim's body was found. On the day of the incident, Rucker was at home working on his second-floor deck when he heard a loud noise coming from a nearby alley. He saw two or three men chasing another man from the alley and across a nearby vacant lot. The group of men were being followed by a beige Chevy and a Ford Bronco. The men did not have anything in their hands at this time and they were shouting "vulgar names" at the victim. The Chevy followed the men through the vacant lot while the Ford drove south to the "T" in the alley and then drove west to Waller Street. Rucker lost sight of the incident when he walked to the bedroom window at the front of his house to get a better view. When Rucker reached the bedroom window, he saw six men beating the victim and he also saw the Chevy and the Bronco, which were now empty. The victim was lying on the ground and could not protect himself because "they were beating him too bad." All six men took turns using weapons to beat the victim, and Rucker explained that one of the weapons looked like a bat and the other looked like a tire iron or crowbar. Rucker did not see the men kicking or hitting the victim and he did not see anyone throw a pole or a bat at him. Rucker moved to his front porch and saw that the men were still beating the victim. The victim tried to crawl under a car but men pulled him out and continued to beat him. The beating lasted approximately 10 minutes and the men then "jumped" into the two cars with the bat and the tire iron and drove from the scene.

¶ 10 Rucker spoke to the police that day and during the course of the investigation he was shown various photographs by the police. He could not describe for police the attackers' hairstyles or facial hair, but he did say that one of the attackers was much heavier than the others–approximately 300 pounds–and that another attacker had scars. On May 10, Detective David Gillespie showed Rucker three photo arrays which included photographs of Dwayne Thompson and Vonzell Franklin. Rucker identified a photograph of Powell as someone who chased and beat the victim. Approximately one week later, on May 14, Rucker viewed a lineup at the police station. He identified defendant as one of the men who beat the victim and as the person who he was "almost sure" was driving the Chevy. Rucker also identified Simpson as one of the men chasing the victim and Wallace as a passenger in the Chevy.

¶ 11 On cross-examination, Rucker testified that he gave a handwritten statement approximately one week after the incident but claimed that he did not remember telling police that he saw the attackers stomp on the victim's head. When shown his handwritten statement, Rucker denied having signed it and claimed that his signature on the statement looked "altered." Rucker further testified that he was 100% sure of the lineup identifications he made on May 14, and he did not recall telling a defense investigator that was 90% sure of those identifications.

¶ 12 Johnny Graves testified that he was originally charged with first degree murder in connection with his role in the victim's death. Graves later pled guilty to conspiracy to

---

[2]Defendant did not ultimately call these experts during trial.

commit murder and entered into an agreement with the State's Attorney's office by which, in exchange for his truthful testimony, he would be sentenced to 14 years' imprisonment with day-for-day good-time credit after defendant's trial concluded. Graves acknowledged that he expected to serve 6½ to 7 years in prison after good-time credit and that a murder conviction would have meant a 20-year minimum sentence, a 60-year maximum sentence and no good-time credit. After making his deal with the prosecution, Graves was also put in a special area of the prison and received special privileges. Graves also had a prior felony conviction for manufacturing and delivery of a controlled substance.

¶ 13     Graves testified that on the afternoon of May 8, 2006, he was at his cousin's house when defendant and codefendant Marcel Simpson arrived in defendant's orange Ford Bronco. Graves got into the car and the group drove to the store. While Simpson was in the store, Graves was sitting in defendant's vehicle when he saw the victim getting off the "el" train at Central and Lake Streets and pointed him out to defendant. Defendant then made a call on his cell phone. The group was going to drive back to Graves's cousin's house but defendant was on the phone and instead they drove to West End and Waller. Defendant was driving, Simpson was in the front passenger seat and Graves was sitting in the back. Graves knew that there had been an altercation between the victim and Dwayne Powell a month or two ago during which the victim kicked out Powell's teeth. Graves had never had a problem with the victim and he had "no clue" as to what was going to happen that day.

¶ 14     When the group arrived at West End and Waller, defendant was using his cell phone when the group saw the victim coming out of an alley. Graves saw Dwayne Thompson following the victim in his tan or grey Chevy Cavalier and also saw Larron Wallace and Powell inside that vehicle. When the victim ran back down the alley going south, Powell got out of the Chevy and Simpson got out of the Bronco and they chased the victim on foot while Graves and defendant stayed in the Bronco. Thompson drove the Chevy through the alley after the victim and defendant pulled his vehicle "behind them through the alley." The victim ran down the alley and through a vacant lot. Thompson drove through the vacant lot after the victim while defendant turned his vehicle around to cut him off.

¶ 15     Graves testified that the victim ran around the Bronco and that he and defendant jumped out of the vehicle. Defendant threw a pole at the victim and hit him in the back with it from about five to seven feet away. Graves had not seen the pole in the Bronco and did not know where the defendant got it. The victim continued to run until Graves grabbed him. Graves and defendant then started punching and kicking the victim, who fell to the ground. Simpson, Powell, Thompson and Wallace also approached and surrounded the victim. Powell approached the victim with a wooden baseball bat but he fell and dropped it. Simpson picked up the bat and used it to hit the victim once in the head. The victim tried to get up but could not do so and then he was punched, kicked and hit with the bat several more times. Graves could not recall the victim getting hit again with the pole and he did not know if anyone was holding the pole during the beating. Graves identified a photograph of a dumbell as the "pole" which defendant threw at the victim. While on the ground, the victim tried to crawl under a car but Graves pulled him out by his legs. The group continued to punch and kick the victim and they also hit him with the pole several more times. Somebody said, "lets go," and then Graves, Powell and Wallace entered Thompson's vehicle while defendant and

Simpson got into defendant's vehicle and they all drove away from the scene. Graves was arrested approximately three weeks later and initially denied involvement in the crime. He testified that he lied to the police when he denied involvement in order to distance himself from the crime. However, when he most recently spoke to police, he told them a version of events that was the same as his testimony at trial.

¶ 16    Graves testified that although Wallace, Thompson and Powell stood in a circle around the victim, they did not actually participate in beating the victim. He explained that Wallace was the biggest of the six men and weighed approximately 260 pounds. Graves testified that he has a scar on his forehead and another on his neck.

¶ 17    Dwayne Thompson testified that he was currently serving an eight-year prison sentence for a drug conviction from Champaign County along with two concurrent one-year sentences for drug convictions in Cook County. He also had a prior conviction for driving on a revoked license. Thompson testified that he had no agreement with the prosecution in exchange for his testimony in this case.

¶ 18    Thompson further testified that he "somewhat" recalled the events of May 8, 2006. He used his girlfriend's beige Chevy Cavalier to go and buy shoes for his children but claimed he never made it to the store because he started gambling in an alley near his home. Thompson also let Wallace borrow the car later that day. Wallace left with the car but returned a couple of hours later. Thompson entered the car and he and Wallace drove around the neighborhood for a while until they "ran into the situation." He explained that they initially drove to Lake Street but then drove to "where some other guys was" at Waller and West End, where he saw defendant's orange Bronco. Thompson did not see anyone other than defendant in the Bronco and he did not see anyone running in the area. Thompson "couldn't see from the distance" what was taking place because he "wasn't close enough up on it to be able to pinpoint exactly what was happening." Around June 15, Thompson went to downstate Illinois in order to "lay low for a while" and he got into some "legal problems" while he was there.

¶ 19    On cross-examination, Thompson testified that Detectives James Gilger and Vaulkner visited him in the Champaign County jail in September of 2007 and that they said they wanted Thompson to be a witness. At trial, Thompson agreed that it was better to be a witness than a defendant. Thompson could "not recall" if he told the detectives that he drove to Waller and West End and saw the orange Bronco and Graves and Powell running in the alley. Thompson then testified that he told the detectives that he did see Graves and Powell chasing after the victim. He also told the detectives that five people were involved in the beating, but he could not recall the names he gave to the detectives. On October 24, 2007, while he was still in the Champaign County jail, he was visited by Detective Gilger and Assistant State's Attorney (ASA) Phyllis Porcelli. Thompson acknowledged that he answered ASA Porcelli's questions and that he gave a handwritten statement but he denied telling the ASA anything about the victim's murder or saying the things that were contained in the statement. He claimed that the specific statements about the murder had been put in his statement by someone else.

¶ 20    ASA Phyllis Warren testified that on October 24, 2007, she accompanied Detectives

Gilger and Volker to the police station to interview Thompson.[3] The ASA explained to Thompson her role in the case and that she wanted to speak to him about the victim's death. Thompson agreed to speak with her. The ASA and the detectives spoke to Thompson for about an hour and then ASA Warren spoke to Thompson alone to ask if anyone had made threats or promises to him and Thompson said no. ASA Warren then wrote out a statement based upon what Thompson had told her and she showed him some photographs, which he identified. ASA Warren verified that Thompson could read by having him read the first paragraph of the statement to her and then she read the rest of the statement to him. Thompson signed every page and indicated that he was giving the statement voluntarily and that no threats or promises were made to him in return for giving the statement. The ASA also did not promise Thompson any deal regarding his Cook County drug cases in exchange for his statement and she did not compare his statement to the one he previously gave to the detectives. ASA Warren then published Thompson's statement to the jury.

¶ 21    In the statement, Thompson stated that in February of 2006, the victim was acting "crazy," snatching people's money or pouring out their liquor. Around that time, the victim got into a verbal confrontation with Powell, but Thompson did not know if it was physical. Thompson heard that the day after the verbal confrontation, Powell had his teeth kicked in by the victim and his brother and some other men with baseball bats and poles.

¶ 22    At approximately 4 p.m. on the day of the incident, Thompson borrowed his girlfriend's tan Chevy Cavalier. He stopped to play some cards and, while doing so, Wallace asked to borrow the vehicle. Thompson let Wallace use the car and Wallace returned sometime later and told Thompson that Graves had called and told him that "they" were chasing the victim. Thompson got into the car with Wallace and they drove toward Waller and Lake streets because that is where Graves told Wallace they were going. At that location, Thompson saw the victim running through an alley and also saw defendant's orange Bronco chasing behind the victim. Powell and Simpson were running behind the Bronco and Graves got out of the Bronco and joined the chase. Thompson and Wallace parked nearby and Thompson saw the victim lying on the ground next to a car while defendant, Simpson and Graves beat the victim. Defendant had a metal pole, "maybe like a tire iron," and was hitting the victim with it everywhere but his head. Simpson was hitting the victim in the head with a baseball bat and Graves was "stomping" and kicking the victim's body. Thompson did not know if Powell hit the victim and did not think Wallace did because he was standing by the car. Simpson repeatedly hit the victim in the head with the bat and, after one of the blows, Thompson heard what sounded like a "turtle shell cracking" and heard a girl say, "oh, they killed him." Thompson and Wallace then left in the Cavalier.

¶ 23    Thompson concluded by stating that no deals had been made in any of his cases in exchange for his statement, which he was giving freely and voluntarily, and that no threats or promises were made to him. Thompson also stated that the police and the ASA had treated him "right" and that when the police visited him in jail in September of 2007, he told them the same version of events he was relating in this statement.

---

[3]At the time of the investigation, ASA Warren's last name was "Porcelli."

¶ 24    On cross-examination, ASA Warren testified that she reviewed Detective Gilger's reports about his September 2007 interview with Thompson and that, based upon those reports, she considered Thompson a witness and not a suspect. She acknowledged that the detective's notes indicated that Thompson drove the Chevy and pursued the decedent.

¶ 25    Franklin testified that he was currently in custody on two cases. He was charged with contempt of court for not appearing on a subpoena in this case and he was in possession of narcotics when he was arrested for contempt. Franklin also had three prior felony drug convictions. However, Franklin testified that no promises were made to him in exchange for his testimony in this case.

¶ 26    Franklin testified that he spoke with Simpson on the night of the incident but he could not remember what Simpson told him about the beating. Franklin could not remember whether he told police that during that conversation, Simpson admitting hitting the victim 30 times in the head with a baseball bat. Franklin admitted that he knew defendant and that he told police where defendant's Bronco was located. He knew the location of the Bronco because two days after the incident, he picked defendant up and defendant asked him to look at his car. Franklin identified a photograph of himself and Powell that was taken on March 6, 2006, at Franklin's birthday which showed Powell with his teeth knocked out. He also admitted that Powell had been beaten up by the victim and others who knocked Powell's teeth out with bats and sticks. On cross-examination, Franklin testified that the police threatened to charge him with the victim's murder if he did not tell them "something," and that he was not charged in connection with the victim's death.

¶ 27    Chicago police detective John Valkner testified that he spoke with Franklin about a week after the incident and that Franklin was in custody at the time as a suspect in the victim's murder. The State played a videotape of Detective Valkner's interview with Franklin, in which Franklin stated that Simpson admitted hitting the victim 30 times in the head with a bat.

¶ 28    Detective David Gillespie testified that he met with Rucker at his home on May 10, 2006, and showed him some photo arrays. Rucker identified Powell in the first array as one of the men who beat the victim. Rucker made no identifications from the other two photo arrays which included photographs of Thompson and Franklin.

¶ 29    Detective James Gilger testified that on May 14, 2006, he went with Franklin to an address and located defendant's 1987 orange and tan Ford Bronco. Later that day, defendant signed a consent to search form for the Bronco. Detective Gilger searched the vehicle and observed a 12-inch-long metal pipe with a "collar" on the end that turned out to be a dumbbell between the driver's seat and the center console. At approximately 9:45 a.m. that day, Rucker viewed a lineup at the police station made up of defendant, Simpson, Wallace, Franklin and two "fillers." Rucker identified defendant, Wallace and Simpson. Defendant was identified as driving the Bronco, Simpson was identified as chasing the victim and Wallace was identified as being someone who was inside the vehicle and who got out of the vehicle. All three were identified as having participated in beating the victim. Detective Gilger also testified that ASA Lauretta Froelich took a handwritten statement from Rucker. Rucker told the ASA that six men took turns beating the victim with a bat and a metal bar

and stomping on the victim's head. The detective also testified that the Chevy Cavalier was later recovered and that a search warrant was obtained for the car. The Cavalier was processed by an evidence technician. Detective Gilger went to Rucker's house on May 31 with a photo array that included Thompson but Rucker made no identification. Rucker also did not identify Graves or Powell in ensuing lineups.

¶ 30    The parties stipulated that the Illinois State Police crime lab detected no latent prints suitable for comparison and no traces of blood on the dumbbell or the "collar" recovered from the Bronco. The parties further stipulated that defendant was the registered owner of the Bronco. The parties stipulated that no blood was found on any of the evidence recovered from the Bronco or the Cavalier. It was stipulated that the victim's clothing was recovered but never submitted for trace or micro analysis.

¶ 31    The parties further stipulated to the results of the autopsy performed on the victim's body. The victim had fractures on both sides of his skull, a comminuted or multifragmentary fracture along the skull and three lacerations on this back of his head which aligned with the fractures underneath. The victim also had a bruise above his right eye, internal head injuries caused by the comminuted fractures, and a total of 10 contusions to the brain located at the fracture sites. The cause of death was craniocerebral injuries from blunt trauma due to assault. The State rested its case following these stipulations.

¶ 32    The first defense witness called was investigator Quentin Hall. Hall spoke with Rucker on January 25, 2007, and Rucker told Hall that he was 90% sure of his identifications. Hall measured the distance from Rucker's second-floor window to the place the victim was found lying and it was 164 feet.

¶ 33    The defense also called Detective Gilger as a witness. The detective testified that he and Detective Valkner interviewed Thompson at the Champaign County jail on September 17, 2007, and that he was present when ASA Warren interviewed Thompson in October of 2007. The detective agreed that there were some differences between what Thompson told the detectives in September and what he told the ASA on October 24, 2007. Specifically, Thompson told Detective Gilger that Powell and Graves chased the victim by foot but he told ASA Warren that Powell and Simpson chased him by foot. Further, Thompson told Detective Gilger that defendant, Powell, Graves, Simpson and Wallace beat the victim but he told the ASA that defendant, Simpson and Graves beat him. The detective also testified that Thompson was not charged because nobody identified him.

¶ 34    The next defense witness was Wallace, who was Powell's cousin. Wallace testified that on the day of the incident he and Thompson rode to the area of 123 North Waller in Thompson's Cavalier but that he did not remember anyone else in the car. Wallace admitted striking the victim twice with a baseball bat. At first, Wallace testified that he did not remember seeing defendant or his Ford Bronco on Waller before the beating, stating that "it went too fast" and "everything happened too quick." Wallace then agreed, however, that on May 8, at about 5:20 p.m., he saw defendant, Simpson, Graves, Thompson and Powell on the 100 block of Waller. He also saw the victim, who was not his friend. Wallace then testified that "[o]ur car chased him down. I got out. And struck him twice with the object I was holding." He said the object was a bat but he could not remember where he struck the

victim.

¶ 35 On cross-examination by the State, Wallace admitted that defendant and Simpson were two of the men that he was with on the day of the incident. Wallace further admitted that defendant's Ford Bronco was there that day but Wallace testified that he did not know who was in the Bronco. When asked if the Bronco was one of the vehicles chasing the victim, Wallace responded, "I guess. I don't know. I was in the front car." Wallace then testified that he did not know if Simpson or defendant was present when the victim was beaten or if other people hit the victim with a bat and a pole. Wallace then admitted that during a "prior proceeding" on May 7, 2007, he agreed and swore to certain facts that were read into the record. Wallace agreed to having sworn that the victim was running toward Waller street, that the victim was caught by all six men chasing him and that Wallace kicked the victim and hit him with a baseball bat. Wallace also swore that in addition to himself, defendant, Simpson, Graves, Thompson and Powell punched and kicked the victim and hit him with a bat and what was believed to be a barbell.

¶ 36 The jury found defendant guilty of first degree murder and the trial court subsequently sentenced him to a term of 30 years' imprisonment. This appeal followed.

¶ 37 Defendant first contends that the trial court erred when it denied his motion *in limine* to preclude the State from introducing evidence from defendant's videotaped confession to impeach two physicians that defendant intended to call in his defense. Defendant claims that this ruling denied him the right to present "critical probative evidence" to the jury that would have contradicted the testimony of the State's witnesses that defendant threw a metal pole at the victim or used one as a weapon.

¶ 38 The State initially responds that defendant has forfeited this issue because he did not ultimately call the medical experts to testify at trial. The State relies upon *Luce v. United States*, 469 U.S. 38 (1984), *People v. Whitehead*, 116 Ill. 2d 425 (1987), and *People v. Patrick*, 233 Ill. 2d 62 (2009).

¶ 39 In *Luce*, the petitioner moved for a ruling to preclude the government from using a prior conviction to impeach him if he testified. The district court ruled that the prior conviction fell within the category of permissible impeachment evidence under Federal Rule of Evidence 609(a). *Luce*, 469 U.S. at 39-40. The petitioner did not testify, and the jury returned guilty verdicts. The court of appeals affirmed, holding that since the petitioner did not testify, it would not consider the petitioner's contention that the district court abused its discretion in denying his motion *in limine* without making a finding, as required by Rule 609(a)(1), that the probative value of the prior conviction outweighed its prejudicial effect. At the time the case was decided, Rule 609(a) provided:

"General Rule.–For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted if elicited from him or established by public record during cross-examination but only if the crime (1) was punishable by death or imprisonment in excess of one year under the law under which he was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the defendant, or (2) involved dishonesty or false statement, regardless of the punishment." Fed. R. Evid. 609(a).

The Supreme Court affirmed. The Court observed the difficulty in reviewing an evidentiary question under Rule 609(a)(1):

"A reviewing court is handicapped in any effort to rule on subtle evidentiary questions outside a factual context. This is particularly true under Rule 609(a)(1), which directs the court to weigh the probative value of a prior conviction against the prejudicial effect to the defendant. To perform this balancing, the court must know the precise nature of the defendant's testimony, which is unknowable when, as here, the defendant does not testify." *Luce*, 469 U.S. at 41.

The Court further observed that any possible harm from the ruling on the motion *in limine* was speculative because the ruling was subject was subject to change and, without the defendant's testimony, a reviewing court could not determine whether the government would have sought to impeach with the prior conviction. *Id.* at 42. The Court therefore held that "to raise and preserve for review the claim of improper impeachment with a prior conviction, a defendant must testify." *Id.* at 43.

¶ 40    In *Whitehead*, our supreme court adopted the reasoning set forth in *Luce*. In that case, the defendant made motions *in limine* seeking to limit cross-examination of the defendant's psychiatric expert and admissions that the defendant made during his treatment regarding prior attacks on young girls. *Whitehead*, 116 Ill. 2d at 442-43. The trial court denied both motions and ruled that "the State would be afforded an opportunity to raise the earlier admissions of knife attacks on young girls depending upon the testimony actually elicited on direct examination of [the psychiatrist] and the defendant." *Id.* at 443. The court also refused the defendant's offer of proof on the substance of his direct testimony that the defendant claimed would have allowed the court to rule *in limine* on the scope of cross-examination. *Id.* On appeal, the defendant argued that these rulings made him drop his insanity defense and forced his decision not to testify on his own behalf, and he claimed that he did not call the psychiatrist because evidence of prior convictions would have been allowed. *Id.*

¶ 41    Our supreme court affirmed. The court recognized that the trial court's ruling was conditioned on the direct testimony actually given and observed:

"Because neither [the psychiatrist] nor the defendant testified, this court cannot determine whether the trial court would have erroneously permitted the State to raise the substance of defendant's 1975 statements in cross-examination. The defendant claims that [the psychiatrist] was not called because evidence of prior crimes would have been allowed. The State responds to that claim by saying that the doctor was not called because the State would impeach his testimony with evidence of previous false claims of amnesia by the defendant. The record supports both explanations, demonstrating the difficulty of reviewing hypothetical cross-examination. This court should not speculate what the substance of [the psychiatrist's] and the defendant's testimony on direct examination would have been or what the prosecution would have asked during cross-examination of those witnesses, and it follows that no decision on the appropriate scope of cross-examination can be had on appeal of this case. Counsel must stand on their objections and call the witnesses, thus opening the possibility that an erroneous decision on the scope of examination might occur and require review by a reviewing court, or

-11-

forgo calling the witnesses and adopt an alternative strategy. But defense counsel may not have it both ways by altering their trial strategy to make the best of the trial court's order, depriving the reviewing court of a reviewable record, and still maintain that the order was erroneously entered." *Id.* at 443-44.

¶ 42    Our supreme court recently considered this issue in *Patrick*. In that case, the defendant filed a motion *in limine* asking the trial court to rule on the admissibility of prior convictions if the defendant chose to testify. *Patrick*, 233 Ill. 2d at 67. The court granted the motion in part and determined that one of the convictions could be admitted, but stated that it "could not determine whether three other convictions *** were more probative than prejudicial until he heard [the defendant's] testimony." *Id.* Based on the trial judge's ruling, the defendant chose not to testify. *Id.* The court noted that the appellate court had found that the trial court abused its discretion in refusing to rule on the admissibility of the prior convictions until after the defendant testified but declined further review of the error because the defendant did not testify. *Id.* at 77.

¶ 43    The court began by reviewing the decision in *Luce* and *Whitehead*. The court noted that in *Whitehead*, "this court required defense witnesses and defendant to testify and obtain a definitive ruling before the issue could be properly reviewed on appeal. This court's rationale in *Whitehead* goes beyond the *Luce* rationale and provides this court's independent basis for requiring a defendant to testify and preserve the issue for review." *Id.* at 79. The court then observed:

> "In both *Whitehead* and [the appellate court opinion in the case before it], the defendant could not be certain whether the disputed evidence would be admitted until after the direct testimony was given. In both cases, the defendants were making decisions about whether to present direct testimony without knowing if the unwanted evidence would be admitted. Nonetheless, this court ruled in *Whitehead* that defendants must take the risk and present the testimony for the issue to be reviewable." (Emphasis omitted.) *Id.* at 79.

Based on the foregoing, the court held that the defendant failed to preserve his right to appellate review of the issue because he chose not to testify. *Id.*

¶ 44    Defendant claims that these cases are distinguishable from the present case and, relying upon the holding in *People v. Easley*, 148 Ill. 2d 281 (1992), he claims that he need not have called his experts to testify in order to preserve the issue. In *Easley*, the defendant made an incriminating statement to a Department of Corrections investigator. *Id.* at 308. The trial court suppressed the statement, finding that under a recent appellate court decision, the informant was an agent of the State and was therefore required to apprise the defendant of his fifth amendment rights. *Id.* at 309. In its final ruling on the issue, the trial court held that the otherwise suppressed statement could be used for impeachment purposes if the defendant testified. *Id.*

¶ 45    On appeal, our supreme court found that although the defendant did not testify, the constitutional issues he raised were properly before the court. *Id.* at 310. The court noted that "although the trial court was concerned with making rulings in advance of the underlying issues being raised, it did in fact rule on the merits of the constitutional issues defendant

-12-

raises." The court then addressed and distinguished the holding in *Luce*:

> "And, while the Supreme Court has held that to raise the claim of improper impeachment with a prior conviction, a defendant must testify (*Luce v. United States* (1984), 469 U.S. 38 ***), the Court declined to review the errors defendant raised on the basis of the special requirements of Rule 609(a) of the Federal Rules of Evidence. Justice Brennan, in a concurrence joined by Justice Marshall, wrote that in cases 'in which the determinitive question turns on *legal* and not *factual* considerations, a requirement that the defendant actually testify at trial to preserve the admissibility issue for appeal might not necessarily be appropriate.' (Emphasis added.) *Luce*, 469 U.S. at 44 *** (Brennan, J., concurring, joined by Marshall, J.)." *Id.*

¶ 46 We believe that the present case presents a situation more similar to that found in *Easley* than to the ones presented in *Luce*, *Whitehead* and *Patrick*, and we therefore find that defendant's claim of error is properly before us. In this case, unlike in the cases cited by the State, the trial court made a definitive ruling that defendant's suppressed statement could be used for impeachment purposes. The trial court's ruling did not turn on primarily factual considerations such as weighing the probative value of a prior conviction versus its prejudicial effect under Federal Rule of Evidence 609(a)(1). Nor was the trial court's ruling conditional and dependant upon the testimony actually elicited by the witness on direct examination. There is also no question as to whether the State was going to impeach defendant's proposed experts with portions of defendant's suppressed statement, as the State clearly represented to the court that it would do so if defendant called those witnesses. The trial court's ruling on the motion *in limine* was also one of constitutional dimensions and the propriety of that ruling turns primarily on a legal question, specifically, whether under the United States Supreme Court's holding in cases such as *James v. Illinois*, 493 U.S. 307 (1990), the State should be allowed to use defendant's suppressed statement to impeach defense witnesses other than the defendant himself. Finally, unlike the cases cited by the State and as will be more fully explained below, the record is sufficient for this court to review the propriety of the trial court's ruling and to conclude that, even if the ruling was error, it was harmless beyond a reasonable doubt. For these reasons, we find that defendant has not forfeited his claim that the court's ruling denied him the right to present probative evidence on his own behalf. We now turn to the merits of that claim.

¶ 47 Rulings on evidentiary matters, including motions *in limine*, are within the sound discretion of the trial court and will not be reversed absent an abuse of that discretion. *People v. Harvey*, 211 Ill. 2d 368 (2004). An abuse of discretion occurs when the trial court's decision is arbitrary, fanciful, unreasonable, or when no reasonable person would take the same view as the trial court. *People v. Smith*, 406 Ill. App. 3d 747 (2010).

¶ 48 Under the exclusionary rule, evidence seized in violation of a defendant's fourth amendment rights is generally inadmissible at trial. *People v. Sutherland*, 223 Ill. 2d 187, 227 (2006). However, an exception to the exclusionary rule allows the prosecution to introduce illegally obtained evidence for the limited purpose of impeaching the credibility of a defendant's own testimony. *James*, 493 U.S. at 312.

¶ 49 In *James*, the United States Supreme Court considered whether this exception should be

extended to allow the prosecution to impeach the testimony of all defense witnesses with illegally obtained evidence. In that case, the defendant was arrested for murder and made a statement to police that the previous day his hair had been reddish brown, long and combed straight back. *Id.* at 309. The trial court later found that the defendant had been arrested without probable cause and suppressed his statement to police. *Id.* At trial, witnesses identified the shooter as having reddish hair that was long and slicked back and the defendant called a witness who testified that on the day of the shooting defendant's hair was black. *Id.* at 310. The State sought to introduce the defendant's illegally obtained statement to impeach this witness's testimony. The trial court allowed the State to do so and defendant was ultimately found guilty of the crimes charged. *Id.*

¶ 50    The Illinois Supreme Court affirmed the trial court's ruling and extended the impeachment exception to the exclusionary rule to "permit the prosecution to impeach the testimony of all defense witnesses with illegally obtained evidence." (Emphasis omitted.) *Id.* at 309 (citing *People v. James*, 123 Ill. 2d 523 (1988)). The Illinois Supreme Court reasoned that in order to deter the defendant from engaging in "perjury by proxy," the impeachment exception should be extended to allow the State to impeach the testimony of defense witnesses other than the defendant himself. *Id.* at 311.

¶ 51    The United States Supreme Court reversed and declined to so extend the impeachment exception. *Id.* The Court stated:

> "In this case, the Illinois Supreme Court held that our balancing approach in *Walder* and its progeny justifies expanding the scope of the impeachment exception to permit prosecutors to use illegally obtained evidence to impeach the credibility of defense witnesses. We disagree. Expanding the class of impeachable witnesses from the defendant alone to all defense witnesses would create different incentives affecting the behavior of both defendants and law enforcement officers. As a result, this expansion would not promote the truth-seeking function to the same extent as did creation of the original exception, and yet it would significantly undermine the deterrent effect of the general exclusionary rule. Hence, we believe that this proposed expansion would frustrate rather than further the purposes underlying the exclusionary rule." *Id.* at 313-14.

The Court specifically noted that the "perjury by proxy" concern was "suspect" because the threat of criminal prosecution for perjury was more likely to deter a witness from intentionally lying than to deter a defendant, already facing criminal prosecution, from lying on his own behalf. *Id.* at 314. The Court also expressed concern that "expanding the impeachment exception to encompass the testimony of all defense witnesses likely would chill some defendants from presenting their best defense–and sometimes any defense at all–through the testimony of others." *Id.* at 314-15.

¶ 52    In this case, under the holding in *James* and its rejection of impeachment to rebut "perjury by proxy," the State should not have been allowed to use portions of defendant's suppressed statement to impeach defendant's proposed medical expert witnesses if they testified at trial. We also note that here the risk of so-called "perjury by proxy" was negligible in that the proposed defense testimony was that of medical professionals with regard to their objective findings. Nevertheless, for the reasons that follow, we find that the

-14-

error was harmless beyond a reasonable doubt. See *Easley*, 148 Ill. 2d at 320-21 (finding that even if it was error to allow a statement obtained in violation of the due process clause to be used for impeachment purposes, the error was harmless beyond a reasonable doubt in light of the overwhelming evidence of the defendant's guilt).

¶ 53    Defendant's offer of proof was weak at best and is an insufficient basis upon which to conclude that the verdict would have been different had defendant's medical experts testified. Defense counsel never outlined exactly what the experts' opinions would be and instead counsel only indicated that the doctors diagnosed defendant with Hill-Sachs deformity. While counsel stated that this testimony would prove that defendant could not have committed the crime as alleged, counsel never represented that the experts would offer this opinion. Most importantly, there was no offer made that either expert would testify that defendant could not have thrown a metal pole or used one as a weapon or that he could not have otherwise beaten the victim. At most, counsel represented that the testimony would be that defendant would "at least have a diminished capability for performing that (throwing or hitting the victim with a pole)." The offer of proof also did not indicate what arm defendant throws with or if his alleged shoulder injury was to that same arm. The offer of proof did not even indicate if this alleged injury existed on the day of the murder.

¶ 54    In contrast to defendant's offer of proof, three eyewitnesses identified defendant as having participated in beating the victim. It is true that the proposed expert testimony could have been used in an attempt to impeach Graves's testimony that defendant threw a metal pole at the victim and hit him with it in the back. However, Graves was the only person to offer this specific testimony and whether defendant threw a metal pole was at most a minor portion of the State's case. The remainder of Graves's testimony was consistent with the testimony of the State's other witnesses that defendant participated in the beating death of the victim.

¶ 55    Morever, defendant was tried under an accountability theory and therefore he need not have even wielded or thrown a metal pole at the victim in order to have been found guilty. An individual commits the offense of first degree murder when he or she intends to kill or do great bodily harm and knows that his or her acts will cause death, or knows that the acts create a strong probability of death or great bodily harm. 720 ILCS 5/9-1(a)(1), (2) (West 2010). Under Illinois's accountability statute, a person is legally accountable for the conduct of another when "either before or during the commission of an offense, and with the intent to promote or facilitate [such] commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2010).

¶ 56    To prove the defendant had the intent to promote or facilitate the crime, the State must present evidence that establishes, beyond a reasonable doubt, that (1) the defendant shared the criminal intent of the principal or (2) there was a common criminal design. *In re W.C.*, 167 Ill. 2d 307, 337 (1995). "Active participation has never been a requirement for the imposition of criminal guilt upon the theory of accountability." *People v. Ruiz*, 94 Ill. 2d 245, 254 (1982). "Accountability may be established through a person's knowledge of and participation in the criminal scheme, even though there is no evidence that he directly participated in the criminal act itself." (Internal quotation marks omitted.) *People v. Velez*,

388 Ill. App. 3d 493, 512 (2009). Words of agreement are not required to prove a common design or purpose between codefendants; a common design may be inferred from the circumstances surrounding the crime. *People v. Batchelor*, 171 Ill. 2d 367, 376 (1996). In determining a defendant's legal accountability, the trier of fact may consider the defendant's presence during its commission, the defendant's continued close association with other offenders after its commission, the defendant's failure to report the crime, and the defendant's flight from the scene. *People v. Taylor*, 164 Ill. 2d 131, 141 (1995). "Evidence that a defendant voluntarily attached himself to a group bent on illegal acts with knowledge of its design supports an inference that he shared the common purpose and will sustain his conviction for an offense committed by another." *In re W.C.*, 167 Ill. 2d at 338. "Absent other circumstances indicating a common design, presence at the scene and flight therefrom do not constitute *prima facie* evidence of accountability; however, they do constitute circumstantial evidence which may tend to prove and establish a defendant's guilt." *People v. Foster*, 198 Ill. App. 3d 986, 993 (1990).

¶ 57 In this case, even if defendant did not use a metal pole to attack the victim, the evidence presented at trial was more than sufficient to find him guilty of murder under an accountability theory. The evidence indicated that defendant was driving his vehicle with Graves and Simpson when Graves saw the victim and pointed him out to defendant. Defendant made a call on his cell phone and then drove the group to the area of West End and Waller Streets. According to Thompson's statement, Wallace picked Thompson up in Thompson's car and said that Graves had just called and said that "they" were chasing the victim and were headed toward Waller and Lake Streets. Thompson's vehicle then headed to the area of West End and Waller. In other words, the evidence established that these two vehicles began in different locations, that there was cell phone communication between people in each vehicle and the two vehicles ultimately converged at the location where the beating occurred. The jury could infer from this evidence that defendant was knowingly part of a common plan or design to attack the victim. The evidence further indicated that when defendant's vehicle arrived in that area, the group spotted the victim coming out of an alley and defendant pursued him in his vehicle and cornered him in a vacant lot. After the beating, defendant also fled the scene in his vehicle with at least one of the other attackers. See *People v. Gomez*, 127 Ill. App. 3d 551, 556 (1984) ("a person who knowingly drives a get-away car is accountable for the crimes committed"). Defendant did not report the crime after it occurred.

¶ 58 This evidence established that defendant was more than merely present at the scene of the crime. The evidence was sufficient for the jury to conclude that defendant was actively engaged in aiding and abetting the other attackers in pursuing the victim, committing the crime charged and then driving one of the get-away cars. Therefore, even if defendant had introduced evidence that he had a diminished capacity to either throw or wield a metal pole, defendant would have still been found guilty beyond a reasonable doubt. Accordingly, the trial court's ruling on defendant's motion *in limine* was harmless.

¶ 59 Defendant next contends that he was denied a fair trial when the trial court precluded defense counsel from introducing evidence that Wallace's prior statements implicating defendant were made in exchange for a plea to a lesser offense and a reduced sentence.

¶ 60    The record shows that after the State rested its case, codefendant Simpson's counsel indicated that he would be calling Wallace as a witness. The State made a motion *in limine* to bar defense counsel from introducing evidence that Wallace, who was originally charged as a codefendant in this case with first degree murder, pled guilty to second degree murder and received a 17-year prison sentence. The State pointed out that Wallace pled guilty without any promise to testify for the prosecution and that no deals were made with him for later testimony. The State also expressed concern that Wallace was being called so that the defense could argue or imply that the cases against defendant and Simpson was a case of second degree rather than first degree murder. When arguing the motion, codefendant Simpson's counsel claimed that it was proper to bring out that Wallace was in prison, that he was charged in connection with his role in this case and that he pled guilty to second degree murder in exchange for a 17-year sentence. Counsel claimed that the State had opened to the door to the issue by explaining what happened to the other five men involved in the crime and that the defense had a right to explain to the jury what happened to the sixth man, Wallace. Simpson's counsel further stated that he did intend to make an argument to the jury based upon the deal that Wallace made with the State. Defendant's counsel stated that he agreed and adopted Simpson's counsel's argument. The trial court found that this line of questioning was not relevant and ruled that counsel could not bring out the fact that Wallace pled guilty to second degree murder or the sentence that he received. The court noted that unlike with Wallace, the line of questioning was relevant when Graves had been called as a witness by the State because he pled guilty to a lesser offense in exchange for his testimony against defendant and Simpson. The court also agreed with the State that it would be improper to let the defense argue or imply that because Wallace was convicted of second degree murder, defendant should be convicted of the same offense or that the case against defendant did not amount to first degree murder.

¶ 61    Defendant claims that the trial court's ruling was an abuse of discretion because the terms of Wallace's plea were relevant to showing bias and because Wallace's testimony on direct examination challenged the strength of the State's identification evidence. Defendant claims that the terms of Wallace's plea agreement were relevant because the facts he swore to at his plea hearing implicated defendant in the crime and therefore evidence that Wallace pled guilty to a reduced charge would have supported an argument that the sworn facts from Wallace's plea were unreliable. Thus, defendant argues that he was denied the right to rehabilitate a witness after that witness was impeached with a prior inconsistent statement.

¶ 62    As noted, rulings on motions *in limine* and other evidentiary issues are within the sound discretion of the trial court and will not be reversed absent an abuse of that discretion. *People v. Harvey*, 211 Ill. 2d 368 (2004). Moreover, evidence is relevant if it has a tendency to prove or disprove a fact that is of consequence to the determination of the action. *Id.* However, even when evidence is relevant, it may, in the trial court's discretion, be excluded if its prejudicial effect substantially outweighs its probative value. *People v. Lewis*, 165 Ill. 2d 305, 329 (1995). Thus, in deciding whether to admit evidence, a trial court must weigh the likely prejudicial effect of evidence against its probative value. *People v. Walker*, 211 Ill. 2d 317, 338 (2004).

¶ 63    We find no abuse of discretion in the trial court's ruling on the motion *in limine*. It is

true, as defendant points out, that the exposure of a witness's motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination. See *Davis v. Alaska*, 415 U.S. 308, 316-17 (1974). Similarly, the fact that a witness has been arrested or himself charged with an offense may be inquired into for the purpose of showing that his testimony might be influenced by bias, interest or a motive to testify falsely. *People v. Adams*, 129 Ill. App. 3d 202, 207 (1984). Therefore, "[t]he jury is entitled to hear the defense theory that the witness may be testifying falsely because he is or was vulnerable to pressure from the police regarding his own connection with the crime." *Id.*

¶ 64 However, unlike in the cases cited above, Wallace was called by the defense, not the State, and therefore there is no issue as to whether he testified at trial pursuant to an agreement with the State. Defendant points out that Graves was questioned about his deal with the State. However, Graves was originally charged with first degree murder but pled guilty to conspiracy to commit murder and entered into an agreement with the State's Attorney's office by which, in exchange for his truthful testimony, he would be sentenced to 14 years' imprisonment with day-for-day good-time credit after defendant's trial concluded. Therefore, inquiry into the nature of that deal and whether it influenced his testimony was relevant and a proper subject of examination. Here, however, there was never any indication by defense counsel that Wallace's plea agreement was conditioned on his agreement to the factual basis presented. Defense counsel merely wanted to bring out the plea deal to raise that implication. The trial court was reasonably concerned that bringing out Wallace's plea deal would imply to the jury that the case against defendant did not amount to first degree murder. In the absence of any substantiation of the theory that Wallace agreed to this factual basis as a result of his plea deal, it was not an abuse of discretion for the trial court to bar details of the plea agreement.

¶ 65 We also find that defendant has forfeited this claim. The motion *in limine* was not argued in the context of rehabilitating Wallace after he was impeached. Rather, the State moved *in limine* to bar the terms of the plea deal when counsel for Simpson announced that Wallace would be called as a witness. When the motion *in limine* was argued, the context in which it was raised was the State's request to bar details of the plea agreement during direct examination of Wallace. Counsel for Simpson argued that he should be allowed to explain during his examination of Wallace what happened to the other persons charged in this offense. Counsel for the defendant herein joined in that argument. The State argued that this was irrelevant and would imply to the jury that other dispositions were more appropriate than a finding of guilty of first degree murder. The trial court agreed with the State's position in this regard. There was some vague argument by Simpson's counsel that if Wallace did not testify according to his expectations from the factual basis of the plea then the terms of the plea could become relevant. The trial court responded by indicating that defense counsel could impeach Wallace with his sworn testimony at the plea hearing if he strayed from that testimony. However, defense counsel never argued that he should be allowed to rehabilitate Wallace with the terms of his deal if he was impeached by the State. Further, after Wallace was impeached by the State, defense counsel never attempted to rehabilitate him with the terms of the deal or otherwise asked the trial court to revisit its prior ruling on the issue. In order to preserve an issue for appeal, defendant must raise the issue at trial and in a posttrial

motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988); see also *People v. Leak*, 398 Ill. App. 3d 798, 829 (2010) (an objection upon a specific ground is a waiver of all grounds not specified). By failing to do so, defendant deprived the trial court of an opportunity to rule on the issue and perhaps to have granted defendant's request. For this reason, we find defendant's claim forfeited.

¶ 66　　Defendant next contends that he received ineffective assistance of counsel. Defendant claims that his counsel conceded defendant's presence at the scene of the crime and thereby demonstrated a lack of understanding of accountability theory. Defendant argues that counsel was thus ineffective for presenting a defense that left the jury with no choice but to return a guilty verdict.

¶ 67　　Claims of ineffective assistance of counsel are resolved under the standard set forth *in Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Supreme Court delineated a two-part test to use when evaluating whether a defendant was denied the effective assistance of counsel in violation of the sixth amendment of the United States Constitution. Under *Strickland*, a defendant must demonstrate that counsel's performance was deficient and that such deficient performance substantially prejudiced defendant. *Strickland*, 466 U.S. at 687. To demonstrate performance deficiency, a defendant must establish that counsel's performance fell below an objective standard of reasonableness. *People v. Edwards*, 195 Ill. 2d 142, 162 (2001). In evaluating sufficient prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Defendant must satisfy both prongs of this test in order to prove ineffective assistance of counsel. *Strickland*, 466 U.S. at 687.

¶ 68　　In order to properly evaluate defendant's claim, we first recount the prosecution's closing argument because defense counsel's argument was partially made in response to that closing. The prosecution began its closing by reading the accountability instruction that would later be given to the jury and then explaining to the jury how the instruction applied to the facts of the case. The prosecutor stated, "[b]asically that means the team. The kill team." The prosecutor then used several sports analogies to illustrate the concept, including that the Chicago Blackhawks had won the Stanley Cup and that everyone on the team received a ring, including the owners and the people in charge of the players' baggage. The prosecutor stated, "it is the same for criminals. He knowingly solicits, aids, abets, agrees to aid or attempts to aid the other person."

¶ 69　　It was in this context that defense counsel made his closing argument. Counsel began by arguing that there was a lack of physical or corroborating evidence. Counsel discussed the other evidence and stated, "[b]ut I tell you if you believe that Antonio was part of a kill team, or team kill, then you have to be certain that all the players are playing with the same goal. That they are playing by the same rules." Counsel further argued that "there was no team involvement for Antonio" and no evidence of a long-planned mission to get revenge upon the victim. Counsel attacked the testimony of the State's eyewitnesses and then made the following complained-of remarks:

"The State has talked at length about the computer generation about the legal responsibility of the conduct of another person. And I submit to you that in this case, before you assess [defendant's] responsibility as being one of these team players, you must be certain they are all playing by the same rules and the same goal.

[Defendant] didn't run interference for the quarterback. Or the running back. He wasn't the lead runner in a marathon race, trying to make certain that somebody wins the race. His mere presence there, without any active participation in hitting and striking and causing the death, does not make him legally responsible for somebody else, and their activities of swinging the bat.

The bat that did not come from his car. The bat that was not found in his car. The bat that Johnny Graves indicated that he knew where it was. The bat that contains the blood of [the victim]. That blood was never brought back into the Bronco."

¶ 70 Defendant claims through these comments, counsel "insisted" that defendant was present at the scene and overlooked the principle that active participation is not a requirement under accountability. Defendant concluded that, because there was some evidence of a common plan, counsel's arguments left the jury no choice but to return a guilty verdict. We disagree.

¶ 71 Counsel did not "insist" that defendant was present at the scene. Counsel initially attacked the State's eyewitness evidence that placed defendant at the scene with the other attackers. However, in likely recognition that three eyewitnesses placed defendant at the scene, counsel argued that defendant's mere presence at the scene was insufficient to find him guilty under accountability. This was a reasonable strategy and an accurate statement of the law. See *Foster*, 198 Ill. App. 3d at 993. Moreover, as noted above, to prove that defendant had the intent to promote or facilitate the crime, the State was required to prove beyond a reasonable doubt that (1) the defendant shared the criminal intent of the principal or (2) there was a common criminal design. See *In re W.C.*, 167 Ill. 2d at 337. Counsel was essentially arguing that the State had failed to prove that defendant shared the criminal intent of the principal or that there was common criminal design when counsel told the jury that even if it believed defendant was part of the "kill team," the jury had to be sure that all the players were playing with the "same goal." Counsel also told the jury that "as you look through the witnesses, you see that there was no team involvement for [defendant]," that there was no "great plan that [defendant] was part of" and that "[t]here wasn't a mission to seek [the victim] out." Again, this argument was based on an accurate understanding of the law.

¶ 72 Defendant takes counsel's argument out of context when he claims that counsel argued that defendant had to actively participate in the beating in order to be found guilty. When counsel's arguments are viewed in their entirety, counsel was arguing that the State had failed to prove that defendant knowingly participated in the criminal scheme. In addition to arguing that defendant did not hit or strike the victim, counsel also argued that defendant did not bring the bat to the scene of the crime and that he did not take the bat into his car after the crime. In other words, counsel was arguing that defendant did not perform any acts in furtherance of the criminal scheme, such as bringing a weapon that was used or attempting to hide a weapon that was used to beat the victim. Thus, defense counsel's arguments were

part of a reasonable trial strategy and defendant was not prejudiced by counsel's closing argument. For these reasons, we find that defendant did not receive ineffective assistance of counsel.

¶ 73    Defendant next claims that counsel was ineffective for calling Wallace as a witness. Defendant claims that counsel should have known that Wallace would be impeached with the facts he agreed to at his plea proceeding and that those facts would be damaging to defendant's case.

¶ 74    Decisions such as what evidence to present, whether to call a certain witness and what theory of defense to pursue are matters of trial strategy. *People v. Enis*, 194 Ill. 2d 361, 381 (2000). Matters of trial strategy are generally immune from claims of ineffective assistance of counsel. *People v. Smith*, 195 Ill. 2d 179, 188 (2000). A defendant may overcome the "strong presumption" that the challenged action or inaction of counsel was a matter of sound trial strategy by showing that counsel's decision was "so irrational and unreasonable that no reasonably effective defense attorney, facing similar circumstances, would pursue such a strategy." *People v. Jones*, 2012 IL App (2d) 110346, ¶ 82.

¶ 75    Defendant's argument fails because defense counsel did not call Wallace as a witness. Instead, it was codefendant Simpson's counsel that did so. Defendant makes no suggestion that he can assert a claim of ineffective assistance of a codefendant's counsel and we therefore find his claim without merit. Moreover, calling Wallace as a witness was part of a reasonable trial strategy to present multiple versions of the beating to the jury in order to create reasonable doubt as to defendant's guilt. In his reply brief, defendant claims that counsel was ineffective for questioning Wallace after he had been called by codefendant's counsel. However, defense counsel asked only a few questions of Wallace regarding his height and weight and whether the item he used to hit the victim was a bat. These questions did not harm defendant's case and do not establish that counsel was ineffective. Finally, defendant has not shown that he was prejudiced by the addition of Wallace's testimony in light of the other evidence presented at trial. This evidence included Graves's testimony that defendant participated in the crime, Thompson's statements regarding defendant's role in the victim's beating, as testified to by ASA Warren, and Rucker's identification of defendant as the person who drove the Bronco and as one of the men who beat the victim. Given this evidence, defendant has not shown that there is a reasonable probability that the result of his trial would have been different had Wallace not been called as a witness. Accordingly, defendant has failed to carry his burden under the second prong of *Strickland*.

¶ 76    Defendant next contends that he was denied a fair trial because the trial court failed to question the prospective jurors on their understanding and acceptance of the legal principles outlined in *People v. Zehr*, 103 Ill. 2d 472 (1984), and set forth in Illinois Supreme Court Rule 431(b) (eff. May 1, 2007). We review defendant's contention *de novo*. See *People v. Tlatenchi*, 391 Ill. App. 3d 705, 721 (2009) (a trial court's compliance with supreme court rules is reviewed *de novo*).

¶ 77    In *Zehr*, 103 Ill. 2d at 476-78, our supreme court held a trial court abused its discretion during *voir dire* by refusing the defense counsel's request to ask questions about the State's burden of proof, defendant's right not to testify, and the presumption of innocence. The court

reasoned that "essential to the qualification of jurors in a criminal case is that they know that a defendant is presumed innocent, that he is not required to offer any evidence in his own behalf, that he must be proved guilty beyond a reasonable doubt, and that his failure to testify in his own behalf cannot be held against him." *Zehr*, 103 Ill. 2d at 477.

¶ 78 Rule 431(b), which is designed to ensure compliance with *Zehr*, provides:

"The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that the defendant's failure to testify cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's failure to testify when the defendant objects." Ill. S. Ct. R. 431(b) (eff. May 1, 2007).

Rule 431(b) imposes a *sua sponte* duty on the trial court to question the potential jurors as to whether they understand and accept the *Zehr* principles. Such questioning is not dependent upon a request by defense counsel. *People v. Yarbor*, 383 Ill. App. 3d 676, 682 (2008).

¶ 79 In *People v. Thompson*, 238 Ill. 2d 598, 607 (2010), our supreme court considered the requirements of Rule 431(b) and observed that "[t]he rule states that the trial court 'shall ask' potential jurors whether they understand and accept the enumerated principles." The court explained:

"Rule 431(b), therefore, mandates a specific question and response process. The trial court must ask each potential juror whether he or she understands and accepts each of the principles in the rule. The questioning may be performed either individually or in a group, but the rule requires an opportunity for a response from each prospective juror on [his or her] understanding and acceptance of those principles." *Id.*

¶ 80 In this case, the trial court initially admonished the venire as follows:

"It is absolutely essential as we select this jury that each of you understand and embrace these fundamental principles of law, that all persons who are charged with crimes are presumed to be innocent and that it's the burden of the State to prove them guilty beyond a reasonable doubt. What this means is that the defendants have no obligation to testify in their own behalf or to call any witnesses in their defense. They may simply sit and rely upon what they and their lawyers perceive to be the inability of the State to present sufficient evidence to meet the burden of proof. ***

The fact that either defendant chooses not to testify must not be considered by you in any way in arriving at your verdict. *** The bottom line, however, is that there is no burden upon either defendant to prove their innocence. It is the State's burden to prove them guilty beyond a reasonable doubt.

* * *

Now, before we begin the individual voir dire, I want to go back and touch upon those fundamental principles of law I spoke about earlier. And again, I want to treat the room in the four sections that I have. There are approximately–well, not approximately.

-22-

In front of the jury box there are 14 and on each side of the gallery there are approximately 20 people, maybe 25. I spoke about the fact that the defendant is presumed to be–the defendants are presumed to be innocent of the charges against them and this presumption stays with them throughout the trial and is not overcome unless and until the jury determines the defendant is guilty beyond a reasonable doubt. Let's for the purpose of these questions combine the people in the courtroom in one group. Is there anybody in the courtroom who disagrees with this fundamental principle of law? If so, raise your hand.

No hands raised.

I spoke about the fact that the defendants are presumed to be innocent of the charges against them and this presumption stays with them throughout the trial and is not overcome unless and until the jury determines the defendants are guilty beyond a reasonable doubt.

Is there anyone on the left side of the gallery who disagrees with this fundamental principle of law? If so, raise your hand.

No hands raised.

Right side of the gallery, I spoke about the fact that the defendants are presumed to be innocent of the charges against them and this presumption stays with them throughout the trial and is not overcome unless and until the jury determines the defendants are guilty beyond a reasonable doubt. Is there anyone on the left side of the gallery who disagrees with this fundamental principle of law? If so, raise your hand.

No hands raised.

Again to the folks in the courtroom, I also spoke about the fact that the defendant bears the burden of proving–I'm sorry. I also spoke about the fact that the State, the prosecutors, bear the burden of proving the defendants guilty beyond a reasonable doubt. Is there anyone in the courtroom who disagrees with this fundamental principle of law? If so, raise your hand.

No hands raised.

Left side of the gallery, I spoke about the fact that the State bears the burden of proving the defendant guilty beyond a reasonable doubt. Is there anyone on the left side of the gallery who disagrees with this fundamental principle of law? If so, raise your hand.

No hands raised.

And finally the right side of the gallery, I spoke about the fact that the State bears the burden of proving the defendant guilty beyond a reasonable doubt. Is there anyone on the right side of the gallery who disagrees with this fundamental principle of law? If so, raise your hand.

And again, no hands raised.

Because these defendants are presumed to be innocent, they do not have to present any evidence at all in this case. They can simply rely on the presumption of innocence. Is there anyone in the courtroom who disagrees with this fundamental principle of law?

If so, raise your hand.

No hands raised.

Because these defendants are presumed to be innocent, they do not have to present any evidence at all in this case. They can simply rely on the presumption of innocence. Is there anyone on the left side of the gallery who disagrees with that fundamental principle of law? If so, raise your hand.

No hands are raised.

Right side of the gallery, because the defendants are presumed to be innocent, they do not have to present any evidence at all in this case. They can simply rely on the presumption of innocence. Is there anyone on the right side of the gallery who disagrees with that fundamental principle of law? If so, raise your hand.

No hands are raised.

And finally to the folks in the courtroom, the defendants have a constitutional right to choose not to testify in this case. Should the defendants choose not to testify, you must not consider that decision in any way in arriving at your verdict. Is there anyone in the gallery–I'm sorry–in the courtroom who disagrees with that fundamental principle of law? Please raise your hand if you do.

No hands are raised.

Left side of the gallery, the defendants have a constitutional right to choose not to testify in this case. Should the defendants choose not to testify, you must not, may not consider that decision in any way in arriving at your verdict. Is there anyone on the left side of the gallery who disagrees with that fundamental principle of law? If so, raise your hand.

No hands are raised.

And finally right side of the gallery, the defendants have a constitutional right to choose not to testify in this case. Should the defendants choose not to testify, you must not consider that decision in any way in arriving at your verdict. Is there anyone on the right side of the gallery who disagrees with that fundamental principle of law? If so, raise your hand.

And again no hands are raised."

¶ 81      In this case, defendant acknowledges that the trial court collectively asked all of the potential jurors whether they understood the four *Zehr* principles. Defendant claims that the court's inquiry was nevertheless insufficient because the court did not ask the potential jurors whether they also *accepted* those principles.

¶ 82      Defendant acknowledges that his claim is subject to forfeiture because he did not raise an objection in the trial court or in his posttrial motion. See *Enoch*, 122 Ill. 2d at 186. Defendant asks that we review the issue under the plain-error doctrine. Our supreme court has explained that doctrine as follows:

"[T]he plain-error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the

-24-

seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

Defendants bear the burden of persuasion under each prong of the doctrine. *People v. Naylor*, 229 Ill. 2d 584, 593 (2008). Where a defendant is unable to establish plain error, it is incumbent upon a reviewing court to honor the procedural default. *People v. Keene*, 169 Ill. 2d 1, 17 (1995). However, before considering whether plain error occurred, we first determine whether an error actually occurred.

¶ 83 We find no error in this case because the trial court complied with the requirements of Rule 431(b). Defendant essentially complains that the trial court did not employ the precise language of the rule. However, there is no requirement that a trial court use the exact language of the rule and the rule does not "prescribe a precise formula for trial judges to use in ascertaining jurors' prejudices or attitudes." *People v. Emerson*, 122 Ill. 2d 411, 426-27 (1987); *People v. Ingram*, 409 Ill. App. 3d 1, 12 (2011); *People v. Vargas*, 409 Ill. App. 3d 790, 796 (2011); *People v. Strickland*, 399 Ill. App. 3d 590, 604 (2010). In this case, the trial court initially told the venire that it was essential that they all "understand" and "embrace" the four principles. The court then reviewed each principle in depth and confirmed that none of the venire disagreed the principle. We find that the court's admonishments were substantially in accordance with the mandate of Rule 431(b) and were sufficient to confirm the venire's understanding and acceptance of all the principles set forth in the rule. Because we find no error in this case, there can be no plain error and we thus conclude that defendant's claim is forfeited. See *Vargas*, 409 Ill. App. 3d at 796 ("we find no error in the trial court's inquiry and further consideration as to forfeiture or harmless error is unnecessary").

¶ 84 For the reasons stated, the judgment of the circuit court of Cook County is affirmed.

¶ 85 Affirmed.