NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (4th) 180125-U

NO. 4-18-0125

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 30, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Logan County |
| DUSTIN M. MILLER, | ) | No. 16CF101 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | William G. Workman, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Justices Knecht and Holder White concurred in the judgment.

**ORDER**

¶ 1    *Held*: (1) When all of the evidence is viewed in the light most favorable to the prosecution, a rational jury could find the elements of drug-induced homicide to be proven beyond a reasonable doubt.

(2) Defendant has procedurally forfeited his argument that the circuit court violated Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) in the wording of the questions it asked the potential jurors, and because the evidence in the trial was not closely balanced, the doctrine of plain error affords no relief from the forfeiture.

(3) Defendant has procedurally forfeited his objection to irrelevant evidence that the victim had young children, and because the evidence in the jury trial was not closely balanced, the doctrine of plain error does not avert the forfeiture.

(4) Defendant has failed to show prejudice from defense counsel's failure to object to evidence that the victim had young children, that is to say, defendant has failed to show a reasonable probability of a different outcome had defense counsel objected and the circuit court sustained the objection.

(5) Given defendant's criminal record, most notably his apparent incapability of being deterred from trafficking in dangerous and highly addictive drugs, the maximum punishment of 30 years' imprisonment is no abuse of discretion.

¶ 2 In the Logan County circuit court, a jury found defendant, Dustin M. Miller, guilty of the drug-induced homicide of Clint B. Clark. See 720 ILCS 5/9-3.3(a) (West 2016). The court sentenced defendant to imprisonment for 30 years. Defendant appeals on five grounds.

¶ 3 First, defendant argues that the evidence is legally insufficient to sustain his conviction of drug-induced homicide. We disagree. When we view all of the evidence in the light most favorable to the prosecution, resolving all reasonable inferences in the State's favor, we conclude that a rational trier of fact could find the elements of the offense to be proven beyond a reasonable doubt.

¶ 4 Second, defendant contends that the circuit court violated Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) by asking the potential jurors if they "disagreed" with each of the constitutional principles in that rule instead of asking them if they "accepted" each principle. We hold that, by failing to make a contemporaneous objection, defendant has forfeited this issue. We further hold that, although the error in the Rule 431(b) inquiries was clear or obvious, the evidence in the trial was not closely balanced and, therefore, the doctrine of plain error does not avert the forfeiture.

¶ 5 Third, defendant challenges the admission of testimony and photos proving that the victim, Clark, had young children. This issue is procedurally forfeited for the failure to make a contemporaneous objection and the failure to reiterate the objection in a posttrial motion. Because we disagree with defendant's assessment that the evidence in the trial was closely balanced, we conclude that the doctrine of plain error affords no relief from the forfeiture.

¶ 6 Fourth, defendant challenges the 30-year prison sentence as excessive. Given defendant's criminal record, with an emphasis on drug-trafficking, we are unable to characterize the sentence as an abuse of discretion.

¶ 7       Therefore, we affirm the judgment.

¶ 8                                I. BACKGROUND

¶ 9              A. Admonitions and Questions to the Prospective Jurors

¶ 10      On August 8, 2017, the parties selected a jury.

¶ 11      The circuit court admonished eight of the prospective jurors that defendant was presumed innocent until the jury determined, after its deliberations, that he was guilty beyond a reasonable doubt. The court asked the prospective jurors if they understood that rule of law. They answered in the affirmative. The court asked them: "And do any of you disagree with that rule of law?" They answered in the negative.

¶ 12      The circuit court then admonished the prospective jurors that the State had the burden of proving defendant to be guilty of the charge beyond a reasonable doubt. The court asked the prospective jurors if they understood that rule of law. They answered in the affirmative. The court asked them: "Do any of you disagree with that rule?" They answered in the negative.

¶ 13      The circuit court then admonished the prospective jurors that defendant did not have to present any evidence but that, instead, he could rely on the presumption of innocence. The court asked the prospective jurors if they understood that rule of law. They answered in the affirmative. The court asked them: "And do any of you disagree with that rule of law?" They answered in the negative.

¶ 14      The circuit court then admonished the prospective jurors that if defendant chose not to testify, that choice was not to be held against him. The court asked the prospective jurors if they understood that rule of law. They answered in the affirmative. The court asked them: "And do any you disagree with this rule of law?" They answered in the negative.

¶ 15　　　　The circuit court then gave the remaining four empaneled jurors substantially the same admonitions and asked them substantially the same questions.

¶ 16　　　　Finally, the circuit court asked the prosecutor and the defense counsel if they had any follow-up questions for the jurors. The prosecutor asked four of the empaneled prospective jurors: "[T]he four rules of law you were just advised of, do you accept each one of those rules of law that were just told to you?" All four responded in the affirmative. Defense counsel told the court that he had no questions for the jurors. He had raised no objection to the court's admonitions and questions.

¶ 17　　　　　　　　　　　　　　B. The Jury Trial

¶ 18　　　　The jury trial began on August 8, 2017. The first witness for the State was Sarah Ramlow, the ex-wife of the victim, Clint B. Clark.

¶ 19　　　　　　　　　　　　1. *The Testimony of Sarah Ramlow*

¶ 20　　　　Sarah Ramlow testified in effect as follows. She lived in Lincoln, Illinois. For four years, she had been employed at D & D Napa, where she did office work and "kind of delivery, as well."

¶ 21　　　　Ramlow first met Clark in 2003 through mutual friends. Eventually, she began dating Clark. They married in 2006 and had two children together: a daughter, who was nine, and a son, who was eight. In 2013, Ramlow and Clark divorced.

¶ 22　　　　People's exhibit Nos. 1, 2, and 3 were photos of Clark with his family. People's exhibit No. 1 was a photo of Clark with his and Ramlow's two children. It was taken the previous year, on Clark's birthday, June 1, 2016, at his mother's house. People's exhibit No. 2 was a photo of Clark at the eighth-grade graduation of one of his older boys. This was Clark's son by someone else; Clark had two other children by someone other than Ramlow. People's exhibit No. 3 was a

photo taken on Christmas at Clark's mother's house. It showed Clark with his mother and, apparently, Ramlow. His arms were around them.

¶ 23        In June 2016, Clark had his own apartment. Ramlow had been there when dropping off their children and picking them up. She identified People's exhibit Nos. 4 to 10 and 15 and 16 as photos of the apartment's interior.

¶ 24                              2. *The Testimony of Christy Fruge*

¶ 25        On June 3, 2016, at about 12:49 p.m., Christy Fruge, a patrol officer with the Lincoln police department, was dispatched to a duplex at Tremont and Butler Streets. There she saw a woman, Brittany Banser, standing outside. Banser was crying and hysterical; she was yelling and pointing toward one of the apartments of the duplex. Fruge went inside the apartment and into a bedroom, where she found Clark. Christy Fruge recognized Clark, having been close to him in high school. He was lying dead on the bed.

¶ 26        Suspecting a heroin overdose, Fruge questioned Banser, who told her that, before telephoning 911, she had telephoned Tenika Hervey. Hervey's advice to Banser had been to leave the scene immediately. Instead of following that advice, Banser had called 911 and had awaited the arrival of emergency personnel.

¶ 27        Banser told Fruge that she had deleted all the text messages in her phone. Consequently, the police were unable to retrieve any text messages from Banser's phone.

¶ 28                              3. *The Testimony of Crystal Bale*

¶ 29        A paramedic, Crystal Bale, testified that, when she arrived, the man on the bed was obviously dead. Foam flecked with blood had issued from his mouth and onto the bedsheet. Lividity and rigor mortis had set in. A phone lay near the body.

¶ 30                              4. *The Testimony of Christopher Reed*

¶ 31 Christopher Reed was a Lincoln police officer and, more specifically, a crime scene investigator. He took photos of Clark's apartment. One photo showed some personal items on the kitchen counter, including a wallet and "an older cellphone." Another photo was of the nightstand next to the bed. On the nightstand were prescription pills, a hypodermic syringe, and napkins spotted with what appeared to be blood. Another photograph was of Clark holding an Apple iPhone where he lay, deceased, on the bed. The phone was "underneath his body on the front side."

¶ 32 5. *A Stipulation Regarding the iPhone on the Bed*

¶ 33 The parties entered into a stipulation, People's exhibit No. 26. According to this stipulation, People's exhibit No. 25 was the Apple iPhone 6-Plus that Reed had found on the bed, next to Clark's body. The phone had been turned over to the evidence custodian of the Lincoln police department, Michael Fruge (the stipulation continued). A chain of custody had been maintained for the phone. Frank Sarnecki, an intelligence analyst with the United States Drug Enforcement Agency, had performed a forensic analysis of the phone. People's exhibit No. 33, prepared by Sarnecki, was a chart showing the voice calls and text messages transmitted to and from the phone on June 2 and 3, 2016.

¶ 34 6. *The Testimony of Matthew Comstock*

¶ 35 On June 3, 2016, Matthew Comstock, a detective with the Lincoln police department, went to the duplex and searched Clark's vehicle. In the vehicle, Comstock found People's exhibit No. 32, a printout from an automatic teller machine (ATM). The printout showed that, on June 2, 2016, at "11:15," $300 was withdrawn from account No. 4900 at the State Bank of Lincoln.

¶ 36 On cross-examination, Comstock admitted that he had not subpoenaed any records from the State Bank of Lincoln to confirm that account No. 4900 really was Clark's account.

Therefore, Comstock did not "know" it was Clark's account from which the withdrawal of $300 was made at 11:15 a.m.

¶ 37    Defense counsel asked Comstock how he could even know that the withdrawal was made at 11:15 a.m. as opposed to 11:15 p.m., considering that all the printout said was "11:15." Comstock answered that he had gone to Lincoln State Bank and had watched video footage of Clark making the withdrawal. The video showed Clark pulling up to the ATM in his Cadillac. He was alone in the car. He made the withdrawal and drove away.

¶ 38    7. *A Stipulation That Defendant Knowingly Delivered Heroin to Clark*

¶ 39    The parties stipulated that, "on June 2nd, 2016, at approximately 7:14 p.m., Dustin M. Miller, the defendant, while at Qik-n-EZ, 520 Keokuk Street in Lincoln, Logan County, Illinois, knowingly delivered [h]eroin, a controlled substance, to Clint B. Clark."

¶ 40    8. *The Testimony of Brittany Banser*

¶ 41    a. Considerations That the Law Regards as Relevant to Her Credibility

¶ 42    Brittany Banser testified that she was a heroin addict and that her most recent use of heroin was five days before the trial. In 2015, she was convicted of unlawful possession of a controlled substance, a felony.

¶ 43    b. Her Account of What Happened on June 2 and 3, 2016

¶ 44    Clint B. Clark was a friend of Banser's. She had met him through Tenika Hervey, who was Banser's heroin supplier. As of June 2, 2016, Banser had known Clark for approximately six months.

¶ 45    On June 2, 2016, Clark sent Banser a text message inviting her to come over to his apartment and watch some movies. This text message from Clark involved drugs as well. "The

only thing [that Banser could] remember correctly [was that Clark] thought he had gotten ripped off."

¶ 46    Banser decided to accept Clark's invitation. She lived in Bloomington, Illinois, and he lived in Lincoln, Illinois. As Banser was on her way to Lincoln—a two-hour drive—she received a further text message from Clark, which assured her, " [']Nevermind, D delivered it.['] "

¶ 47    Around 7 p.m. on June 2, 2016, before setting out for Clark's house, Banser had "one shot" of heroin—she could not remember the amount. Banser drove to Lincoln and arrived at Clark's house sometime after 9:15 p.m. About 15 minutes to a half-hour after she sat down in Clark's living room, he "gave [her] some of the [h]eroin, and he had a shot."

¶ 48    The prosecutor requested that Banser describe how Clark had presented the heroin to her. Banser answered that she and Clark were sitting next to each other on his couch. He laid the heroin on a center console, an area for drinks. By her rough estimate, the heroin amounted to less than one and a half grams. We quote from the prosecutor's direct examination of Banser:

"Q. And when Clint Clark presented the [h]eroin to you, did you see how much was there?

A. Guess-wise I can, but in court I don't think I can—

Q. Based on your experience with using [h]eroin being an addict.

A. I would say—I believe he paid for 2 grams, but he probably ended up with less than 1 1/2.

MR. PAGE [(DEFENSE ATTORNEY)]: I would object to foundation as to how much he paid.

MR. WRIGHT [(STATE'S ATTORNEY)]: Let me rephrase the question.

THE COURT: All right.

[MR. WRIGHT]: Just from what you saw at Clint's house, based on your experiences using [h]eroin, how much do you believe was present?

A. A gram and a half."

¶ 49 Clark told Banser that, because her tolerance level would be high, she was welcome to use as much of the heroin as she needed—and that she could do so right there. In her testimony, Banser acknowledged that, indeed, she had developed a high tolerance to heroin and that, for her, it took "a lot of [h]eroin to feel it ***, if at all." In Clark's living room, Banser used a hypodermic needle to inject into her body "[p]robably about [0].3 [grams of heroin]," a "little over a quarter of a gram." Then, instead of consuming the rest of the heroin in her presence, Clark took it with him into the bathroom. He returned to the living room about five minutes later.

¶ 50 When Clark sat back down on the couch, everything seemed fine. They talked with one another, watched a movie, and made popcorn. About an hour after taking the 0.3 grams of heroin, Banser took Seroquel, a medicine prescribed to her for post-traumatic stress disorder and insomnia. She took the Seroquel to help her fall asleep. The two of them, she and Clark, stayed awake for two to three hours, during which Banser exchanged several text messages with Hervey. She sent her final text message to Hervey at 11:30 p.m. on June 2, 2016. Eventually, Banser fell asleep on the couch.

¶ 51 Around 10 a.m. or 11 a.m. the next day, June 3, 2016—an hour that Banser regarded as being in "the afternoon"—she woke up. Really, she cautioned, she could not remember for sure when she woke up. (Phone records showed that at 8:41 a.m. on June 3, 2016, Banser telephoned Hervey and that they spoke for approximately 15 minutes.) Banser, when she awakened, was the only person in the living room. The television was still on. Clark was not in sight. His bedroom

door was shut. Banser sat around for a while and replayed the movie he and she watched the night before. She either made or received a phone call—she could not remember which. The phone conversation was with Hervey and Banser's fiancé, Rob Freese. It was about the expected deposit of Banser's final paycheck into her bank account—funds with which Banser intended to buy more heroin, later that day, in Decatur, Illinois.

¶ 52        After talking on the phone, Banser left Clark's apartment and went to a gas station, where she withdrew some cash from an ATM and bought a soda.

¶ 53        From the gas station, Banser returned to Clark's apartment. She sat down again in the living room. She had been gone for 15 to 20 minutes. Clark was still not in sight. His bedroom door was still closed. She turned up the volume of the television until it was extremely loud, attempting to awaken Clark. No one emerged from the bedroom. Finally, she opened the bedroom door and looked in. Clark was unresponsive on the bed. He looked dead.

¶ 54        The next thing Banser could remember was calling 911. She did not remember calling any other phone number. When the police officers arrived, she provided them her phone. She had a habit, however, of deleting all her text messages, to protect other people from getting in trouble because of her heroin addiction (although the deleted text messages, she realized, could "be pulled off the server").

¶ 55        Banser testified that the responding officer, Christy Fruge, asked her "why [her] soda was fresh." Banser "told [Fruge] exactly why and had a receipt." Fruge asked Banser if she had "use[d] and inject[ed] out of the batch *** of [h]eroin that [Clark] had received." Banser answered that, "yes, [she] *** had used the same [h]eroin he had" and, therefore, "[did not] understand why anything would be wrong with him or why it would have caused something." (A condition of Banser's probation, she admitted, was that she abstain from heroin.) But Banser

admitted, in her testimony, that she "d[id] not remember *** the majority of *** anything with the police officers."

¶ 56    9. *Stipulations Regarding the Qik-n-EZ Surveillance Video and the AT&T Records for Clark's iPhone*

¶ 57    The parties stipulated to the accuracy of People's exhibit Nos. 41 and 43. People's exhibit No. 41 was a surveillance video from Qik-n-EZ in Lincoln. The video depicted events that occurred at Qik-n-EZ from 7:11 p.m. to 7:30 p.m. on June 2, 2016. People's exhibit No. 43 consisted of the AT&T records for defendant's Apple iPhone for the period of May 25, 2016, through June 5, 2016, including all the text and media records.

¶ 58    10. *The Testimony of Joseph Meister*

¶ 59    a. The Amount of Heroin That Users Typically Injected

¶ 60    Joseph Meiser was an inspector with the Lincoln police department and was assigned to the Illinois State Police Task Force for Narcotics Enforcement. He testified that a "20 bag," containing a tenth of a gram, was the amount of heroin that users typically injected. It was called a "20 bag" because it sold for $20. The market price of heroin depended on the locality. In Logan County, heroin generally sold for $20 per tenth of a gram. So, a "20 bag" in Logan County was a tenth of a gram of heroin. A full gram would sell for $200, two grams would sell for $400, and so forth.

¶ 61    b. People's Exhibit No. 33, the Report by Sarnecki

¶ 62    People's exhibit No. 33 was a report or chart that Sarnecki had prepared from a computer-aided forensic search of Clark's iPhone. The police were able to access the contents of the phone because Clark's ex-wife, Ramlow, had revealed to them the passcode. Here is what the chart showed.

¶ 63 At 4:34 p.m. on June 2, 2016, Clark sent the following text message to a contact named "Dustin"—who was defendant. "I'm home," Clark wrote, "and I'm really, really starting to hurt. Can you please give me an update? I thought for sure you'd be here by now and I'm nervous as hell plus getting sick."

¶ 64 At 4:35 p.m. on June 2, 2016, defendant replied to Clark (by text message): "chill out bro. i'll be there soon. as fast as i can."

¶ 65 At 5:58 p.m. on June 2, 2016, Clark texted defendant:

"It's been an hour and a half now. My mom asked me if I could come look at some lights and my ex asked if I wanted the kids for awhile, but I can't do shit till I get my stuff cause now I'm puking. What's up bro??"

¶ 66 At 6:06 p.m. on June 2, 2016, Clark texted defendant: "Man I need to know what's up here? I'm missing out on my being w[ith] my kids cause I need to get right."

¶ 67 At 6:10 p.m. on June 2, 2016, Clark texted defendant: "Please text me man. You've got me thinking worst case scenario here."

¶ 68 At 6:15 p.m. on June 2, 2016, defendant replied to Clark: "It's cool chill. You know im doin what i can and i cant go any faster."

¶ 69 At 6:20 p.m. on June 2, 2016, Clark texted defendant:

"Dude I'm full blown sick now. I know you can only do so much but I just need to know when your gonna get here man. Please? You know I aient no fucking rat! Just don't bullshit me and tell me your gonna be here soon cause I'm hurting bad and blowing people off cause I can't function right now. I'm not being a dick to you at all but surely you understand that I have almost 400 on the line and I'm sit'n here sick as fuck bro."

Four hundred dollars, Meister explained, would have been an amount of currency consistent with purchasing two grams of heroin.

¶ 70    At 6:27 p.m. on June 2, 2016, Clark texted defendant:

"D I'm asking you as your friend to please tell me what's going on? I don't wanna assume the worst but this isn't making sense why your not back and you won't tell me what's up? We're supposed to have each other's back man. I'll come to you right now if you just tell me where to meet you."

¶ 71    At 6:31 p.m. on June 2, 2016, defendant replied to Clark: "Dude, I CANNOT COME ANY QUICKER THAN I AM ALREADY COMING. it doesnt matter when i tell u im gonna be there it ain't gonna make it any quicker bro. ill be there as soon as i can."

¶ 72    At 6:31 p.m. on June 2, 2016, Clark texted defendant: "As soon as humanly possible."

¶ 73    At 6:51 p.m. on June 2, 2016, Clark texted defendant:

"I've been calling around for help to get right until you got here and this is what I heard. That T told Brittany that today was the last day you could see [Tasha] and that you were brought to pull one over on me and go to Decatur then have your sister pick you up and go to [T]aylorville, and you'd have enough money/shit to last tillyou went in. If it's not true then you've got T saying some pretty shitty stuff about you bro. I consider you a friend and would've never thought this, but that's what I was just told so I have to ask. Don't be pissed at me because I'm not the one saying this. I'm only telling you what was said to me. I just want to get my stuff ASAP and like I said if you need a ride or something you know I'll come get ya."

"Shit" was street slang for drugs, Meister explained, and "calling around for help" meant that Clark was searching for another source of heroin.

¶ 74    At 6:59 p.m. on June 2, 2016, defendant responded to Clark: "Thats because i told her off today and she fucking st[o]le the rest of my shit, and said shes done getting screw[e]d because of me! Lol[.] i cussed her ass out and aint heard from her since."

¶ 75    At 7 p.m. on June 2, 2016, defendant added: "Why would u call around looking for shit when u know im on my way? Thats just dumb. Chill out bro im almost there."

¶ 76    At 7:01 p.m. on June 2, 2016, Clark texted defendant: "I'm sorry bro IM just sick and hurt'n bad. i'm here waiting on ya."

¶ 77    At 7:03 p.m. on June 2, 2016, defendant texted Clark:

"Shes about an idiot. can't even make up a good lie. You know i don't even talk to m[y] sister and why wohld I have her pick me up [i]n [D]ecatur when i could just leave with her here? Shes fucking stupid. And you know i cant see [T]asha today either. Must just be a lie for people with no fucking common sense lmao."

¶ 78    At 7:04 p.m. on June 2, 2016, Clark texted defendant: "It didn't make sense at all and in my mind we[']re tight so I didn't believe it but I had to tell you regardless. I guess I got caught up in the moment cause my anxiety is maxed out and I'm sick."

¶ 79    At 7:05 p.m. on June 2, 2016, Clark texted defendant: "If your almost here I'll stop texting and talk to you in a few minutes. I'm get'n my rig ready now! Lol." "[G]et'n my rig ready," Meister explained, was getting the kit ready to inject heroin. A "rig" was a syringe and sometimes other parts of the kit.

¶ 80　　　　At 7:07 p.m. on June 2, 2016, Clark texted defendant: "Well im with my mom so you gonna have to meet me at a gas station or something real quick. I didnt know she was coming up, it's my sisters bday today…go to quick n easy."

¶ 81　　　　At 7:08 p.m. on June 2, 2016, Clark texted defendant: "Now?"

¶ 82　　　　At 7:08 p.m. on June 2, 2016, defendant texted Clark: "Ill just give u the shit real quick n meet up with u when im done…do you got the money for them two bags I gave ya? u can just give me 30 n call it even." "[T]wo bags," Meister explained, generally meant two bags containing a tenth of a gram of heroin apiece. "[G]ive me 30" meant "give me $30."

¶ 83　　　　At 7:09 p.m. on June 2, 2016, defendant texted Clark: "Yes now."

¶ 84　　　　At 7:10 p.m. on June 2, 2016, Clark texted defendant: "I thought we were square w[ith] my giving you a half but if I was wrong I can get you the money tonight." "[G]iving you half," Meister clarified, meant "giving you half a gram"; a drug could be paid for not only in cash but also by splitting some of it.

¶ 85　　　　At 7:14 p.m. on June 2, 2016, Clark texted Banser: "I just got my stuff thank the Lord. Call me when you get time."

¶ 86　　　　At this point, the direct examination referenced the surveillance video that Meister had obtained from Qik-n-EZ. People's exhibit No. 41A was an assemblage of relevant footage from the 10 cameras of the surveillance system. The video exhibit began at 7:11 p.m. on June 2, 2016, which was right after Clark texted defendant: "I thought we were square ***" (at 7:10 p.m.), and three minutes before Clark texted Banser: "I just got my stuff ***" (at 7:14 p.m.). At 7:11 p.m., the camera facing from the cash register toward the glass front doors of the Qik-n-EZ picked up Clark's white Cadillac backing into the parking lot.

¶ 87       At 1 minute and 21 seconds (again, with 7:11 p.m. as the starting time), defendant entered the store and held the door open.

¶ 88       At 1 minute and 42 seconds, defendant entered the view of the outside camera that was mounted on the soffit on the east side of the store and which faced west.

¶ 89       At 2 minutes and 37 seconds—which was shortly after Clark texted Brittany that he had "just got [his] stuff"—defendant was again standing by the Lotto machine, inside the store. This was defendant's second appearance inside the store.

¶ 90       At 3 minutes and 7 seconds, Clark's Cadillac pulled into the parking lot in front of the store. This was the second time that Clark pulled into the parking lot.

¶ 91       At 3 minutes and 20 seconds, Clark approached the front door of the Qik-n-EZ.

¶ 92       At 4 minutes and 18 seconds, Clark approached the cash register, where defendant was standing with another man, whom Meister identified as Christopher Evans. Clark spoke with defendant. A store clerk was at the cash register. Clark bought some cans of chewing tobacco. The store clerk handed $14 in change to Clark, who already had some currency in his hand.

¶ 93       At six minutes and eight seconds, the three men—Clark, defendant, and Evans— exited the store. As Clark went through the doors, his left hand, holding the folded currency, was extended to defendant, who reached out to receive the currency.

¶ 94       At seven minutes and five seconds, defendant gave Clark a thumbs-up sign.

¶ 95       The direct examination of Meister then refocused on People's exhibit No. 33, the chart of the text messages.

¶ 96       At 7:26 p.m. on June 2, 2016, after the foregoing events shown in the video, Clark texted Banser: "Make sure you call or come over so I'm not nodded out in a bad way. I'm bout to do a big one." "Nodding out," Meister explained, meant being under the influence of heroin.

¶ 97        At 7:29 p.m. on June 2, 2016, Clark texted Banser: "Can you come here now? Might have done too much."

¶ 98        At 7:53 p.m. on June 2, 2016, Clarke sent the following text message to Banser: "This might sound weird since we really don't know each other, but I'd love the company if you wanna come over. You can stay the night and sleep on the couch or I have a blow[-]up mattress. I swear on my kids I'm not a creep and I am not trying to get pussy. I have plenty of shit to share w[ith] you. We can just chill. I'll play a lil guitar and then watch some Netflix?? Just offering. Totally understand if your like, wtf is this guy thinking. Lol. I'm all good and will be here so holler at me one way or another. Be safe."

¶ 99        At 9:05 p.m. on June 2, 2016, Clark texted Banser: "I got ya steak, twice baked potato and corn( leftovers) if your hungry. I'm heating mine now."

¶ 100        At 9:29 p.m. on June 2, 2016, defendant sent the following text message to Clark: "Hey im headed home to[ ]spend a night w[ith] my kids, I'll ttu[(talk to you)] tomorrow."

¶ 101        At 9:29 p.m. on June 2, 2016, Clark replied to defendant: "Ok sounds good. Be safe."

¶ 102        At 9:30 p.m. on June 2, 2016, defendant texted Clark: "Yep, I [*sic*] too make sure u delete texts."

¶ 103        At 9:37 p.m. on June 2, 2016, Clark replied to defendant: "Absolutely." This was the final text message transmitted from Clark's phone.

¶ 104        The final outgoing voice call from Clark's phone was to Banser at 9:31 p.m. on June 2, 2016. It lasted 26 seconds.

¶ 105    On cross-examination, Meister admitted that the phone found in Clark's kitchen, as distinct from the phone found on his bed, had not been subjected to forensic analysis and that it was unknown what was in that phone. Meister further admitted that, although he was aware that Hervey was the first person whom Banser telephoned after finding Clark's body, Meister never tried to subpoena Hervey's phone records and never interviewed her.

¶ 106    Also, on cross-examination, Meister agreed that the text messages between Clark and defendant could be interpreted in different ways. Meister could not rule out the possibility that Clark mistakenly typed "400 on the line" when he really meant "40 on the line." Nor could Meister rule out the possibility that Clark received two-tenths of a gram of heroin in return for $30 instead of paying the standard rate of $40. Meister agreed that the "big one" Clark referenced in his message to Banser could have meant that Clark already had used all the heroin he had bought from defendant. Although Meister's investigation did not uncover any evidence that Clark obtained more heroin "from another source during the course of the night" on June 2, 2016, Meister could not rule out that possibility. On the other hand, Meister could not rule out that the "400 on the line" referred to Clark's buying $400 worth, or two grams, of heroin from defendant.

¶ 107    On redirect examination, Meister explained that the reason why he never subpoenaed Hervey's phone records was that he had seen no need to do so, especially considering the text message that Hervey sent to Clark's phone hours after Clark died. On June 3, 2016, at 6:48 p.m., Hervey texted Clark: "Did u get ahold of dm."

¶ 108    Similarly, the reason why Meister never had Clark's other phone forensically examined was that, given the evidence, he had seen no need to do so. Ramlow, Clark's ex-wife, had told the police that the phone found between Clark's hands was the phone that Clark had been using. Ramlow gave the police the passcode to that phone, and the passcode worked. The phone

of which Meister obtained the forensic analysis was the phone that Clark had taken to bed with him, and it appeared to contain all the relevant data.

¶ 109        On recross-examination, Meister admitted that, in the video, there was no indication that Clark handed $400 to defendant at Qik-n-EZ. Nor did the video show defendant giving anything to Clark. Instead, what could be seen in the video was Clark's payment of $30 to defendant.

¶ 110                      11. *The Testimony of Dr. Scott Denton*

¶ 111        On the second day of the trial, August 10, 2017, the State called Dr. Scott Denton, a coroner's forensic pathologist who was board-certified in three specialties: anatomic pathology, clinical pathology, and forensic pathology.

¶ 112        On June 4, 2016, Dr. Denton performed an autopsy on the remains of Clint B. Clark. In the left elbow crease of the deceased, Dr. Denton found recent puncture marks as well as older puncture marks. On internal examination, Dr. Denton found pulmonary edema, lungs full of fluid. The brain likewise was swollen with edema, from lack of oxygen. Oxygen deprivation typically was the cause of death from an overdose; the user went into a drug-induced coma and stopped breathing.

¶ 113        In Clark's blood, there was a lethal amount of morphine, the breakdown product of heroin. In the urine, Dr. Denton found not only 6-monoacetyl morphine, another breakdown product of heroin, but also a fentanyl metabolite. Fentanyl, Dr. Denton noted, was an opiate 80 to 100 times more powerful than heroin and was now commonly mixed with heroin.

¶ 114        The cause of Clark's death, Dr. Denton concluded, was heroin intoxication.

¶ 115        In the human body, Dr. Denton explained, heroin metabolized into morphine very quickly. Diacetyl morphine, the technical name for heroin, broke down into monoacetyl morphine

very rapidly, within minutes. But the metabolite, monoacetyl morphine, could linger in the blood for a couple of hours.

¶ 116    How quickly an overdose happened varied from person to person. Tolerance was the main factor. Body size was another factor. More chemical would be required to overdose a larger person than a smaller person.

¶ 117    On cross-examination, Dr. Denton testified that, because morphine was still in Clark's blood, he must have died within two hours, more or less, after taking the fatal dose of heroin.

¶ 118    Defense counsel asked Dr. Denton: "[T]here is no cumulative effect of [h]eroin ingestion; in other words, if the user survives a dose, then that dose does not contribute to any overdose in the future; do you agree with that?" Dr. Denton answered:

> "I do because it doesn't build[ ]up. So if you use the [h]eroin and you don't die, you are not going to die from it later on. A separate dose is not going to have anything to do with the prior dose.
>
> Q. Okay.
>
> A. As long as they are not close together. If they are real close together, then you can, but, otherwise, no."

¶ 119    On redirect examination, Dr. Denton explained that the two hours he referenced earlier in his testimony meant two hours from the time of injection. At death, the blood and urine chemistry became frozen in time, until the body began decomposing. But while the person was alive, the heroin, the 6-monoacetyl morphine, and the morphine were all active, depressing respiration. If, when respiration ceased, those active metabolic byproducts were left in the blood

and urine, an inference could be drawn that the heroin was injected within roughly two hours before death.

¶ 120    On recross-examination, Dr. Denton cautioned that the two-hour period could be shorter or longer, depending on the person. Someone who had a high tolerance could be slower in breaking down the heroin. Also, other medications in the blood might interfere with the metabolism. Clark, Dr. Denton noted, had antidepressants in his blood (which did not contribute to his death). The period of two hours was very general, not exact.

¶ 121    12. *A Stipulation Regarding Hervey's Phone Records*

¶ 122    After the State rested, a stipulation was presented regarding Hervey's phone. Defendant's exhibit No. 2 consisted of the AT&T records for her phone for the period of June 2 and 3, 2016. Defendant's exhibit No. 3 consisted of the AT&T voice call records for Hervey's phone.

¶ 123    13. *A Stipulation Regarding What Banser Did and Did Not Tell Christy Fruge*
*(in Completion of Defense Counsel's Impeachment of Banser)*

¶ 124    The parties stipulated to additional testimony by Christy Fruge. If called again to testify further, Christy Fruge would have testified that, when she interviewed Banser on June 3, 2016, Banser denied using heroin at Clark's house the night of June 2, 2016. Fruge would have further testified that Banser omitted telling her that she, Banser, left the house on June 3, 2016, before finding Clark's body.

¶ 125    On August 10, 2017, the jury found defendant guilty of drug-induced homicide.

¶ 126    14. *Defendant's Motion for a New Trial*

¶ 127    On September 5, 2017, defendant moved for a new trial. One of the grounds for this motion was that the circuit court purportedly had erred in its questioning of the prospective jurors. According to defendant, the court had violated Illinois Supreme Court Rule 431(b) (eff.

July 1, 2012) in that, although the court asked the prospective jurors if they understood the *Zehr* principles, the court never asked them if they *accepted* the principles. See *People v. Zehr*, 103 Ill. 2d 472, 476-78 (1984). Instead, the court asked them if they *disagreed* with the principles.

¶ 128                    C. The Posttrial Hearing and the Sentencing Hearing

¶ 129          On November 14, 2017, the circuit court denied the motion for a new trial. As for the Rule 431(b) questions, the court reasoned that, "if there [was] no disagreement" with the *Zehr* principles, necessarily, "then[,] the individuals would agree or accept the principles."

¶ 130          After denying the posttrial motion, the circuit court held a sentencing hearing. According to the presentence investigation, defendant had the following criminal record (in addition to numerous traffic violations).

¶ 131          In Logan County case No. 01-CF-72, defendant was convicted of battery, for which he received a year of probation and 14 days in jail. He successfully served his probation for that offense.

¶ 132          In Logan County case No. 02-CF-165, defendant was convicted of unlawful possession of methamphetamine-manufacturing chemicals. He was sentenced to four years' imprisonment.

¶ 133          In Montgomery County case No. 02-CF-244, defendant was convicted again of unlawful possession of methamphetamine-manufacturing chemicals. He was sentenced to imprisonment for three and a half years.

¶ 134          In Logan County case No. 14-CF-101, defendant was convicted of unlawful participation in methamphetamine production, for which he was sentenced to imprisonment for 20 years. In the same case, he was convicted of unlawful use of property, for which he received a prison sentence of five years.

¶ 135   While defendant was out on bond in Logan County case No. 14-CF-101, he committed the offenses of unlawful possession of a controlled substance in Logan County case No. 15-CF-161 and drug-induced homicide in the present case. Also, when defendant committed the drug-induced homicide in the present case, he was out on bond in Logan County case No. 15-CF-161.

¶ 136   In addition to defendant's criminal record, the State presented three victim impact statements: one from each of Clark's two oldest children and another from Ramlow, the mother of Clark's two youngest children.

¶ 137   The State also presented a copy of the stipulated bench trial from defendant's 2015 felony conviction in Logan County case No. 15-CF-101. In the stipulation, defendant admitted (1) allowing Timothy Hemingway to use his property in Mt. Pulaski, Illinois, to manufacture methamphetamine and (2) buying pseudoephedrine and lithium batteries to be used by Hemingway in manufacturing methamphetamine.

¶ 138   Finally, Meister testified that, previously, in September 2015, the police arrested defendant for unlawful delivery of heroin. Meister described the evidence supporting that charge, which the State ended up voluntarily dismissing.

¶ 139   On the basis of defendant's criminal history, his knowledge of the consequences of trafficking in heroin, and the need for deterrence, the State recommended a 28-year prison sentence.

¶ 140   In mitigation, defense counsel argued that defendant never intended to harm Clark by selling him the heroin. Instead, this case resulted from some "exceptionally bad choices" by defendant which led, quite unintentionally, to Clark's death. Defense counsel pointed out that incarcerating defendant would cause his family to "suffer a loss here, as well." Given those

mitigating factors, defense counsel suggested a mid-range sentence that would "serve to show others the seriousness of the problem that we are facing here in our community and elsewhere" but which would "serve to rehabilitate [defendant]."

¶ 141　　　　After counsel made their arguments, the circuit court found several factors in aggravation. First, the court took note of defendant's criminal record. The court found it "almost inconceivable that [while] awaiting sentencing on a Class 1 felony," defendant would "commit another felony of delivery of a controlled substance"—and that, when "released on bond on that delivery," he would "deliver heroin" yet again. In the court's view, the evidence was "clear that [dealing heroin] is or was [defendant's] chosen profession." The court concluded: "[A] strong message needs to be sent that this is not going to be tolerated in our community." Accordingly, the court sentenced defendant to 30 years' imprisonment—a prison sentence that, by statutory law, had to run consecutively to the 20-year prison sentence defendant already received in Logan County case No. 14-CF-101. See 730 ILCS 5/5-8-4(d)(9) (West 2016) (providing that "[i]f a person admitted to bail following conviction of a felony commits a separate felony while free on bond *** , then any sentence following conviction of the separate felony shall be consecutive to that of the original sentence for which the defendant was on bond or detained.")

¶ 142　　　　　　　　　D. Defendant's Motion to Reduce the Sentence

¶ 143　　　　On November 16, 2017, defendant moved for a reduction of the sentence.

¶ 144　　　　On February 20, 2018, the circuit court held a hearing on this postsentencing motion. In the hearing, the court noted that it "[had], in fact, consider[ed] both statutory and non-statutory factors in mitigation and aggravation." The court had considered defendant's "extensive criminal history at the time that this offense *** was committed." The court recalled: "[T]he defendant did have an extensive criminal history at the time that this offense, the drug-

induced homicide, was committed. In fact, the defendant was out on bond on the participation in the manufacturing of methamphetamine case at the time that the drug-induced homicide was committed."

¶ 145    Also, the circuit court recalled, there was a case, voluntarily dismissed by the State, in which defendant delivered heroin to someone else. In fact, defendant was "was still on bond on that case as well at the time that this offense was committed." Even if defendant himself was undeterrable, the court saw a need to deter other would-be heroin dealers.

¶ 146    The circuit court also had taken into account "the harm that *** both families suffered in this situation, not only the individual that died as a result of receiving the drugs from [defendant], but [defendant's] family," which had suffered from defendant's absence "due to his own actions, due to what he was involved in and had been involved in for a rather lengthy period of time."

¶ 147    Consequently, the circuit court remained of the view that 30 years' imprisonment was the sentence that defendant deserved and that the facts warranted. Accordingly, the court denied the motion to reduce the sentence.

¶ 148    This appeal followed.

¶ 149                                    II. ANALYSIS

¶ 150                         A. The Sufficiency of the Evidence

¶ 151    To find defendant guilty of drug-induced homicide (720 ILCS 5/9-3.3(a) (West 2016)), the jury had to find, beyond a reasonable doubt, that (1) defendant unlawfully delivered heroin to Clark and (2) Clark's death was caused by his ingestion of any amount of the heroin that defendant had delivered to him. Instead of retrying defendant on that charge, we ask the following question: When all of the evidence is regarded in a light most favorable to the prosecution, could

any rational trier of fact have found the two elements of the offense to be proven beyond a reasonable doubt? See *People v. Nere*, 2018 IL 122566, ¶ 69.

¶ 152       Defendant urges a negative answer to that question. He contends that, according to the State's own evidence, Clark bought only two-tenths of a gram of heroin from him at a discounted price of $30. The video, defendant contends, tells the story: the only cash that changes hands in the Qik-n-EZ video is $30. This payment could only have been for two bags of heroin containing a tenth of a gram apiece. (The normal price would have been $40, but, for the sake of customer relations, defendant gave Clark a ten-dollar break.) Two-tenths of a gram was hardly enough to have caused the fatal overdose, given the State's theory of when Clark and Banser consumed heroin in Lincoln during the period of June 2 to 3, 2016.

¶ 153       In the jury trial, the State's theory was that, on June 2, 2016, Clark bought enough heroin from defendant to do the following: (1) inject unspecified amounts of the heroin at least twice on June 2, 2016, that is, immediately after buying the heroin from defendant and, afterward, in the bathroom of Clark's apartment; (2) give three-tenths of a gram to Banser; and (3) inject a third, fatal dose either late at night on June 2, 2016, or in the morning on June 3, 2016. (We note that it is unclear, from Banser's testimony, whether she *saw* Clark inject any heroin in the bathroom.) Two-tenths of a gram of heroin would not have been enough for such collective binging. After all, Banser alone injected three-tenths of a gram, according to her testimony. Therefore, defendant urges us to make an assumption that he regards as a well-nigh unavoidable: after defendant sold heroin to Clark, Banser must have replenished the supply from her own heroin dealer, Hervey—with whom, in fact, Banser was in telephonic communication the night of June 2, 2016, and the morning of June 3, 2016, as telephone records show. The fatal dose of heroin must have come from Hervey, defendant argues, not from the paltry two-tenths of a gram that he sold

to defendant for $30: a quantity of heroin that would have been used up and fully metabolized, without incident, early in the evening.

¶ 154　　　　In support of this argument, defendant quotes from the text message that he sent to Clark on June 2, 2016, at 7:08 p.m. Defendant writes in his brief: "[Defendant] inquired whether Clark had money for 'them two bags' and said that he would take '30 and call it even.' "

¶ 155　　　　But defendant has edited out some inconvenient phrases in that text message from himself to Clark. He texted Clark as follows: "*Ill just give u the shit real quick* n meet up with u when im done. do you got the money for them two bags *I gave ya*? u can just give me 30 n call it even." (Emphases added.). Thus, sometime before meeting with Clark at Qik-n-EZ, defendant "gave" him the two bags—"gave," in the past tense. The two bags were apparently two-tenths of a gram of heroin, for which Clark had not yet paid and for which defendant was willing to accept $30 as full payment. Evidently, Clark had used those two bags up, for he now was sick—he was desperate for heroin—and he had his "rig" ready to inject a "big one" just as soon as he received an "update," a new delivery of heroin, from defendant.

¶ 156　　　　So, it appears, the "two bags" of heroin, the $30 worth, which defendant already had delivered to Clark, were gone, consumed, used up. Those two bags should not be confused with the additional heroin, the update, that defendant owed Clark on June 2, 2016. "Ill just give u the shit real quick," defendant texted Clark—"will," in the future tense. The heroin that defendant had yet to deliver to Clark was the heroin for which Clark had paid almost $400 in advance. In a text message that Clark sent to defendant at 6:20 p.m. on June 2, 2016, he complained to defendant: "[S]urely you understand that I have almost 400 on the line, and I'm sit'n here sick as fuck bro." The phrase "on the line" means "at great risk." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/on%20the%20line (last visited on June 24, 2020).

It would have been nonsensical for Clark to say to defendant that he, Clark, had nearly $400 "on the line" if those funds were still safely in Clark's hands. Clark must have already paid the approximately $400 to defendant—and now Clark was anxiously waiting for defendant to deliver to him the corresponding two grams or so of heroin. As the day wore on and Clark grew sicker and more desperate, he began to fear that defendant had, as Banser put it, ripped him off.

¶ 157 But then, "thank the Lord," relief arrived—outside the view, unsurprisingly, of the 10 surveillance cameras of the Qik-n-EZ. And the relief, it could be readily inferred, was defendant's delivery to Clark of two grams, $400 worth, of heroin. Judging by Clark's blood or urine chemistry, these two grams or so of heroin were laced with fentanyl, an opiate 80 to 100 times more powerful than heroin. Two grams, fortified with highly dangerous fentanyl, were enough to supply the excessive indulgence that ultimately caused Clark's death. Looking at the evidence this way, in the light most favorable to the prosecution, there is no need to speculate that Banser contributed more heroin from her own supplier, Hervey, brought to Lincoln all the way from Decatur, supposedly. There is no evidence that Banser pitched in any heroin. After all, she was the one to be treated, not Clark. The text messages in Clark's phone justify the inference that the fatal dose came from defendant. Such is the reasonable inference that we are required to draw. See *Nere*, 2018 IL 122566, ¶ 69. The evidence, therefore, is sufficient to support the conviction.

¶ 158 B. The Circuit Court's Question to the Prospective Jurors

as to Whether They Disagreed With the *Zehr* Principles

¶ 159 Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) required the circuit court to ask the prospective jurors if they both understood and accepted the *Zehr* principles:

"(b) The court shall ask each potential juror, individually or in a group, whether that juror *understands* and *accepts* the following principles: (1) that the

defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's decision not to testify when the defendant objects." (Emphases added.)

The circuit court asked the prospective jurors if they understood the *Zehr* principles. But instead of asking the prospective jurors if they *accepted* the *Zehr* principles, the court asked them if they *disagreed* with the *Zehr* principles.

¶ 160 Defendant, however, never made a contemporaneous objection. In other words, at the time the circuit court was questioning the prospective jurors, defendant never objected, "Your Honor, under Rule 431(b), you should ask the prospective jurors if they accept these principles instead of asking them whether they disagree with them," or words to that effect. To preserve an issue for appeal, a contemporaneous objection is required. See *People v. Curry*, 2013 IL App (4th) 120724, ¶ 62. Waiting until posttrial proceedings to raise this issue did not preserve this issue for review. See *id.*

¶ 161 Defendant seeks to avert his procedural forfeiture by invoking the doctrine of plain error. See *id.* Specifically, he argues that the evidence in the jury trial was closely balanced and that asking the prospective jurors whether they disagreed with the *Zehr* principles, instead of asking them whether they accepted the *Zehr* principles, could have tipped the wavering scales of justice against the defense and in favor of the prosecution. See *id.*

¶ 162     The first step in plain-error analysis is to decide whether a clear or obvious error was committed. *People v. Sebby*, 2017 IL 119445, ¶ 49. Is it a clear or obvious error to ask prospective jurors if they disagree with the *Zehr* principles instead of asking the prospective jurors if they accept the *Zehr* principles? The appellate court is divided on this question.

¶ 163     On the one hand, in *People v. Morris*, 2013 IL App (1st) 110413, ¶ 83 and *People v. Quinonez*, 2011 IL App (1st) 092333, ¶ 50, the appellate court held it was no error at all, let alone a clear or obvious error, for the circuit court to ask the prospective jurors if they disagreed with the *Zehr* principles instead of asking the prospective jurors if they accepted the *Zehr* principles. Similarly, in *People v. Ingram*, 409 Ill. App. 3d 1, 12 (2011), the appellate court held that the circuit court had satisfied Rule 431(b) by admonishing the prospective jurors of the four principles and then asking them whether they had any " 'difficulty or quarrel' " with each of the four principles. *Morris*, *Quinonez*, and *Ingram* are in a line of cases opining that Rule 431(b) requires no "magic words or catechism to satisfy its mandate." (Internal quotation marks omitted.) *People v. Kidd*, 2014 IL App (1st) 112854, ¶ 36. One of those cases, *Morris*, cites *People v. Emerson*, 122 Ill. 2d 411, 426-27 (1987), for the following proposition: "[T]he rule does not 'prescribe a precise formula for trial judges to use in ascertaining jurors' prejudices or attitudes.' " *Morris*, 2013 IL App (1st) 110413, ¶ 83 (quoting *Emerson*, 122 Ill. 2d at 426-27).

¶ 164     But that is not what the supreme court said at the cited page of *Emerson*. Rather, the supreme court said that "*Zehr* did not attempt to prescribe a precise formula for trial judges to use in ascertaining jurors' prejudices or attitudes." *Emerson*, 122 Ill. 2d at 426-27. The supreme court decided *Emerson* in 1987, and it was not until 1997 that the supreme court codified *Zehr* in Rule 431(b) (Geoffrey Burkhart, *Voir Dire in Criminal Cases—Rule 431(b) Guidance for Lawyers*

*and Judges*, 98 Ill. B.J. 86, 87 (2010)). *Morris* and similar cases take the view that Rule 431(b) is no more stringent in its requirements than *Zehr*.

¶ 165 On the other hand, the Fourth District interprets Rule 431(b) as prescribing particular language for the circuit court to use in its questioning of prospective jurors. To quote from *Curry*, 2013 IL App (4th) 120724, ¶ 64, supreme court cases applying Rule 431(b) have "made clear strict compliance with Rule 431(b) is required in that the trial court must ask each juror, individually or as a group, whether he or she 'understands' *and* 'accepts' the principles and provide each juror an opportunity to respond." (Emphasis in original.) In *People v. Wilmington*, 2013 IL 112938, ¶ 32, for example, the supreme court said: "Rule 431(b) requires that the trial court ask potential jurors whether they *understand* and *accept* the enumerated principles, mandating a specific question and response process." (Emphases in original and internal quotation marks omitted.) The emphases the supreme court used in that passage could be understood as an insistence on particular language, namely, "*understand* and *accept*." (Emphases in original.) *Id.* That is the understanding of the Fourth District, which cautioned in *People v. McGuire*, 2017 IL App (4th) 150695, ¶ 35: "Trial courts must exercise diligence when instructing the jury of the *Zehr* principles as codified in Rule 431(b) *and must not deviate in any way from the precise language chosen by the Illinois Supreme Court to be in that rule*." (Emphasis added.)

¶ 166 So, there is a difference of opinion among districts of the appellate court—and even among divisions of the First District (*cf. Morris*, 2013 IL App (1st) 110413, ¶ 83 (5th Div.) and *People v. Jackson*, 2019 IL App (1st) 161745, ¶ 45 (2d Div.))—over whether deviation from precise language in Rule 431(b) is permissible. "[W]hen conflicts arise amongst the districts, the circuit court is bound by the decisions of the appellate court of the district in which it sits." *Aleckson v. Village of Round Lake Park*, 176 Ill. 2d 82, 92 (1997). The circuit court of Logan

County sits in the Fourth District and, therefore, is bound by decisions such as *Curry*. (*McGuire* was issued after the *voir dire* in this case.) We acknowledge that, in *Wilmington*, 2013 IL 112938, ¶ 32, the supreme court remarked: "[I]t may be arguable that the [circuit] court's asking for disagreement, and getting none, is equivalent to juror *acceptance* of the principles." (Emphasis in original.) But "may be arguable" includes "may not be arguable." In *Curry*, we regarded that remark in *Wilmington* as too noncommittal to override the supreme court's unequivocal holding in *Wilmington*: " 'Rule 431(b) requires that the trial court ask potential jurors whether they *understand* and *accept* the enumerated principles ***.' " (Emphases in original.) *Curry*, 2013 IL App (4th) 120724, ¶ 64. By asking the prospective jurors if they disagreed with the *Zehr* principles instead of asking the prospective jurors if they accepted the *Zehr* principles, the circuit court committed a clear or obvious error. See *id.* ¶ 65.

¶ 167     It is not enough, though, that a clear or obvious error was committed. Another condition of relief, under the first prong of the plain-error doctrine, is that the evidence was closely balanced. See *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). On this question, defendant admits it is "not implausible" that Clark bought enough heroin from defendant for three personal uses, one of which was lethal, and for him additionally to give three-tenths of a gram to Banser. But the problem with that theory, according to defendant, is Banser. "[T]he only evidence suggesting an actual amount of heroin," defendant argues, "was the testimony of Clark's friend, Brittany Banser." And her credibility, in defendant's view, was severely compromised, considering that she was a convicted felon and an unreformed heroin addict who had lied to an investigating police officer, Christy Fruge. Defendant cites *Sebby*, 2017 IL 119445, ¶ 63, for the proposition that "where a finding of guilt rests upon an assessment of credibility, the evidence is closely balanced for purposes of plain error" (to quote defendant's parenthetical note).

¶ 168      But that is not what the supreme court said in the cited paragraph of *Sebby*. Instead, the supreme court said that, if the outcome of the case depended on assessing the credibility of opposing witnesses, either of whom could be believed, the evidence was closely balanced. *Id.* No witness contradicted Banser about the amount of heroin that Clark laid on the center console of his living-room couch. She guessed it was probably less than one and a half grams, although, by her understanding, he had paid for two grams. (But she emphasized that she was only guessing about the amount of heroin that she had seen, and she considered her guess to be so unreliable that she was hesitant to utter it in court.) No witness contradicted Banser's guess. If Clark paid defendant not quite $400 ("almost 400"), he may well have received an equivalent amount of almost—or not quite—two grams of heroin. And if he then did "a big one" before bringing his purchase home, one would expect him to have somewhat less than two grams to lay before Banser on the center console.

¶ 169      Clark bought "almost 400" dollars' worth of heroin, or approximately two grams, from defendant, judging by his text conversation with defendant. That was almost 20 times the normal dose: enough for Clark to overdose even after the preceding uses—especially considering that the fatal dose was laced with fentanyl, which was 80 to 100 times more powerful than heroin.

¶ 170      On appeal, as in the jury trial, defendant tries to explain away Clark's phrase "almost 400 on the line," arguing that the phrase was a slip of the fingers, a typo for "almost 40 on the line." It seems more likely, though, that Clark would use the qualifier "almost" with reference to a larger sum, such as $400, than with reference to a smaller sum, such as $40. And, besides, defendant never texted back to Clark that the amount Clark had paid him was almost $40 instead of almost $400 as Clark remarked. Defendant did not seem shy about correcting Clark on other, perhaps more trivial, matters. By omitting to contradict Clark on the important matter of

how much Clark had paid him, defendant "manifested [a] belief in [the] truth" of Clark's text message. Ill. R. Evid. 801(d)(2)(B) (eff. Oct. 15, 2015). This was, arguably, an admission by silence. See *Dill v. Widman*, 413 Ill. 448, 454 (1952) (noting the "well[-]recognized" rule that "admissions may be implied by silence when the circumstances are such as not only afford an opportunity to act or speak, but also properly and naturally call for action or reply by persons similarly situated").

¶ 171    In sum, when we consider defendant's stipulation to his unlawful delivery of heroin to Clark, the text messages in Clark's phone, the surveillance video showing the two visits to the Qik-n-EZ, and the results of the autopsy, we are unconvinced that the evidence was closely balanced as defendant contends. Those items of evidence appear to provide a complete account. That Banser obtained additional heroin from Hervey and gave it to Clark is unnecessary speculation—not only devoid of any support in the evidence but implausible, considering that Banser had made the two-hour drive from Bloomington to Lincoln so that Clark could share heroin—an expensive commodity—with her, not so that she could share heroin with him. The evidence is not closely balanced. Therefore, the forfeiture of defendant's objection to the circuit court's Rule 431(b) inquiries must be observed. See *People v. Naylor*, 229 Ill. 2d 584, 593 (2008).

¶ 172    C. Another Claim of Plain Error: Informing the Jury That Clark Had Children

¶ 173    At the beginning of its case, the State called Sarah Ramlow, Clark's ex-wife, and asked her: "And do the two of you have any children together?" She answered: "We do. Mia Clark, who is nine, and Hunter Clark, who is eight." The prosecutor also asked Ramlow:

"And does [Clark] have other children?

A. He does.

Q. And how many other children does he have?

- 34 -

A. Two."

These other two children, Ramlow testified, were not hers but were Clark's children by someone else. She identified photographs of Clark with his family, and the circuit court allowed the prosecutor to publish the photographs to the jury—all without objection by defense counsel. People's exhibit No. 1 was a photograph of Clark seated at a table with two children, with his arms around them. People's exhibit No. 2 was a photograph of Clark by himself (at the eighth-grade graduation of one of his sons, Ramlow testified). People's exhibit No. 3 was a photograph of Clark standing between his mother and (apparently) Ramlow, with his arms around them.

¶ 174    More than half a century ago, the supreme court held that such a calculated attempt to arouse sympathy for the victim and to inflame the passions of the jury against the defendant was *per se* reversible error unless the defense objected and the circuit court sustained the objection and instructed the jury to disregard the evidence:

> "[W]here testimony in a murder case respecting the fact that the deceased has left a spouse and family is not elicited incidentally, but is presented in such a manner as to cause the jury to believe it is material, its admission is highly prejudicial and constitutes reversible error unless an objection thereto is sustained and the jury instructed to disregard such evidence." *People v. Bernette*, 30 Ill. 2d 359, 371 (1964).

Indeed, *Bernette* held that, even if the defense failed to object, "the irrelevancy and highly prejudicial nature of such evidence [was] so well established, that it was the duty of the court in a murder case to have refused it on its own motion." *Bernette*, 30 Ill. 2d at 373. In other words, the error was so plain and so delegitimizing to the trial that the circuit court should have taken corrective action on its own initiative.

¶ 175 In a later case, however, instead of finding reversible error *per se* in unobjected-to testimony regarding the victim's family, the supreme court prescribed the now-familiar plain-error analysis. See *People v. Kitchen*, 159 Ill. 2d 1, 33-34 (1994). The analysis is as follows:

> "[T]he plain-error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Piatkowski*, 225 Ill. 2d at 565 (explaining *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005)).

In *Naylor*, 229 Ill. 2d at 593, the supreme court held that "[w]hen a defendant fail[ed] to establish plain error" as described in *Piatkowski*, "the result [was] that the procedural default [had to] be honored." (Internal quotation marks omitted.).

¶ 176 Conceding that his defense counsel failed to take the two essential steps to preserving a challenge to Ramlow's testimony and the family photos—namely, a contemporaneous objection and the reiteration of the objection in a posttrial motion (see *id.* at 592)—defendant seeks to avert the procedural default by invoking the doctrine of plain error. Specifically, he argues that a clear or obvious error occurred and the evidence was so closely balanced that the error alone threatened to tip the scales of justice against him. See *Piatkowski*, 225 Ill. 2d at 565.

¶ 177 We agree that letting Ramlow testify regarding Clark's children, right down to specifying their ages, and that admitting and publishing photos of his children and other family

members amounted to a clear and obvious error. Such evidence was irrelevant to the question of guilt and was potentially inflammatory.

¶ 178    As we already have discussed, however, we disagree that the evidence was closely balanced. Therefore, the procedural forfeiture of defendant's irrelevancy objection, which he makes on appeal for the first time, will be observed. See *Naylor*, 229 Ill. 2d at 593.

¶ 179                    D. The Claim That Defense Counsel Rendered Ineffective
                    Assistance by Failing to Object to Ramlow's Testimony

¶ 180    Defendant claims that his defense counsel rendered ineffective assistance by failing to object to Ramlow's testimony, thereby causing the procedural forfeiture. An allegation of ineffective assistance has two elements: (1) defense counsel's performance fell below an objective standard of reasonableness and (2) the defendant was prejudiced as a result. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *People v. Albanese*, 104 Ill. 2d 504, 526 (1984). Prejudice is defined as a reasonable probability that, but for defense counsel's deficient performance, the outcome of the proceeding would have been more favorable to the defendant. *Strickland*, 466 U.S. at 687-88, 694. If it is possible to do so, we may resolve an allegation of ineffective assistance by proceeding directly to the question of prejudice. *People v. Patterson*, 2014 IL 115102, ¶ 81.

¶ 181    The prejudice element of an ineffective-assistance claim is similar to the first prong of the plain-error doctrine. See *People v. Johnson*, 218 Ill. 2d 125, 143 (2005). Because there was no prejudice for purposes of the first prong of plain error, there was no prejudice for purposes of ineffective assistance. See *id.* at 144.

¶ 182    The jury would have learned, anyway, from Clark's text messages, that he had an ex-wife and young children. See *Kitchen*, 159 Ill. 2d at 34 (remarking that the references to the family members were "incidental to other testimony"). All that Ramlow's testimony additionally provided was the ages and a photo of the children. As for the photo of Clark's mother, the jury

would have learned, anyway, from his text messages, that Clark had a mother, who relied on his help around the house. Consequently, there is no reasonable probability that the exclusion of Ramlow's testimony would have made any difference in the verdict. See *Strickland*, 466 U.S. at 687; *Albanese*, 104 Ill. 2d at 526. The theory of ineffective assistance fails on the element of prejudice.

¶ 183                                   E. Defendant's Challenges to the Sentence

¶ 184        Defendant was convicted of drug-induced homicide (720 ILCS 5/9-3.3(a) (West 2016)). This was a Class X felony (*id.* § 3.3(b)), punishable by imprisonment for not less than 6 years and not more than 30 years (730 ILCS 5/5-4.5-25(a) (West 2016)). The prosecutor recommended 28 years' imprisonment. The circuit court imposed the maximum term of 30 years' imprisonment.

¶ 185        For four reasons, defendant characterizes this maximum sentence as an abuse of discretion. See *People v. O'Neal*, 125 Ill. 2d 291, 297-98 (1988) (noting that the supreme court "has consistently held that the imposition of sentence is a matter of judicial discretion and the standard of review to determine whether a sentence is excessive is whether the trial court abused that discretion").

¶ 186        First, the circuit court considered, as an aggravating factor, that defendant committed the present offense while he was free on bond and waiting to be sentenced for a prior felony conviction of unlawful participation in methamphetamine production. But statutory law already took that aggravating factor into account, defendant argues, by requiring that the sentence of imprisonment in the present case run consecutively to the sentence of imprisonment in the methamphetamine case. See 730 ILCS 5/5-8-4(d)(9) (West 2016) ("If a person admitted to bail following conviction of a felony commits a separate felony while free on bond ***, then any

sentence following conviction of the separate felony shall be consecutive to that of the original sentence for which the defendant was on bond \*\*\*."). Defendant objects to the imposition of a double penalty on this circumstance that he reoffended while being out on bond.

¶ 187   The State contends that defendant has forfeited this sentencing issue by failing to raise it in his motion to reduce the sentence. "In order to preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required." *People v. Harvey*, 2018 IL 122325, ¶ 15. In his postsentencing motion, defendant never argued that section 5-8-4(d)(9) of the Unified Code of Corrections (730 ILCS 5/5-8-4(d)(9) (West 2016)) precluded the circuit court from counting, as an aggravating factor, defendant's reoffending while he was out on bond. The general excessive-sentence language in the postsentencing motion did not fairly apprise the circuit court of this issue and give it an opportunity to address the issue. See *People v. Heider*, 231 Ill. 2d 1, 18 (2008). If a defendant has a specific sentencing issue to raise, the defendant has to set forth the issue in a reasonably informative way in the postsentencing motion instead of stonewalling with boilerplate language. Thus, we agree with the State that this sentencing issue is forfeited.

¶ 188   In the event of such a forfeiture, defendant invokes the doctrine of plain error. "The initial step under either prong of the plain error doctrine is to determine whether the claim presented on review actually amounts to a clear or obvious error at all." (Internal quotation marks omitted.) *People v. Harvey*, 2018 IL 122325, ¶ 15. Defendant admits that as a statutory factor in aggravation, a trial court may consider that a "defendant committed an offense while he was out on bail for a prior felony and he was convicted of that felony \*\*\*." *People v. Kendall*, 213 Ill. App. 3d 782, 789 (1991) (citing Ill. Rev. Stat. 1987, ch. 38, par. 1005-3-3.2(a)(11), later codified as 730 ILCS 5/5-5-3.2(a)(12) (West 2016)). Defendant cites no authority making an exception to the

aggravation if, additionally, the sentence must be consecutive under section 5-8-4(d)(9) of the Unified Code of Corrections. See 730 ILCS 5/5-8-4(d)(9) (West 2016). Apparently, there is no case law to that effect. Therefore, defendant has failed to show an error that is clear or obvious, and the forfeiture of this sentencing issue will be observed. See *Naylor*, 229 Ill. 2d at 593; *People v. Keene*, 169 Ill. 2d 1, 17 (1995); *People v. Hammons*, 2018 IL App (4th) 160385, ¶ 17.

¶ 189     Second, defendant complains that although the State had dismissed the charge of unlawful delivery of a controlled substance in Logan County case No. 15-CF-161, the circuit court went ahead and used that delivery as an aggravating factor in the present case.

¶ 190     The State responds that, by failing to make an objection in the sentencing hearing and by failing to reiterate the objection in a postsentencing motion, defendant has procedurally forfeited this sentencing issue as well. See *Harvey*, 2018 IL 122325, ¶ 15. The State is correct. Again, the doctrine of plain error fails to come to the rescue. The error, if any, is less than clear or obvious, considering that "prior uncharged criminal conduct is relevant in a sentencing determination." *People v. Flores*, 153 Ill. 2d 264, 296 (1992). "The voluntary dismissal of criminal charges before trial is, in effect, a *nolle prosequi*." *People v. Van Schoyck*, 232 Ill. 2d 330, 340 (2009). "A *nolle prosequi* is not an acquittal of the underlying conduct that served as the basis for the original charge but, rather, it leaves the matter in the same condition as before the prosecution commenced." *People v. Hughes*, 2012 IL 112817, ¶ 23. Therefore, the *nolle prosequi* in Logan County case No. 15-CF-161 effected a return to the status quo *ante*: it made the unlawful delivery that was the subject of that case once again uncharged conduct. And it is well-settled that uncharged conduct is relevant at sentencing. *E.g.*, *Flores*, 153 Ill. 2d at 296; *People v. Ivy*, 313 Ill. App. 3d 1011, 1019 (2000). "Proof of prior misconduct not resulting in prosecution or conviction is admissible as relevant to the question of defendant's character." *People v. Johnson*, 114 Ill. 2d

170, 205 (1986). The proof of prior misconduct in this case was Meister's testimony regarding the unlawful delivery, testimony that was admissible in the sentencing hearing. See *id.* Thus, absent an error that was clear or obvious, the procedural forfeiture of this sentencing issue likewise will be observed. See *Naylor*, 229 Ill. 2d at 593.

¶ 191          Third, the circuit court cited the need for deterrence as an aggravating factor, saying that it "believe[d] a clear message does need to be sent and that a strong message needs to be sent that this is not going to be tolerated within our community." Defendant complains that, "by relying on the need for deterrence as an aggravating factor, the trial court punished [him] based on the proposed conduct of others rather than the seriousness of his own, non-violent conduct." But section 5-5-3.2(a)(7) of the Unified Code of Corrections provides as follows:

> "(a) The following factors shall be accorded weight in favor of imposing a
> term of imprisonment or may be considered by the court as reasons to impose a
> more severe sentence ***:
>
> * * *
>
> (7) the sentence is necessary to deter *others* from committing the
> same crime." (Emphasis added.) 730 ILCS 5/5-5-3.2(a)(7) (West 2016).

We could not reasonably fault the circuit court for considering a factor that, under section 5-5-3.2(a)(7), a sentencing court "shall" consider. *Id.* "[G]enerally, use of the word 'shall' indicates a mandatory obligation unless the statute indicates otherwise." *People v. Thomas*, 171 Ill. 2d 207, 222 (1996).

¶ 192          Fourth, defendant argues that the circuit court "failed to recognize that [defendant] did not need a lengthy prison sentence for rehabilitation and, more importantly, had already once proven his potential for [rehabilitation]." Specifically, "[p]rior to his brief incarceration between

2003 and 2005, [defendant] was employed with a tree-cutting service." Subsequently, defendant represents he "founded and ran a successful tree cutting business," and "[d]uring this time he also acted as the primary caregiver for his two oldest children." The presentence investigation report reads: "The defendant self-reported he ran this business up until he went to jail in September 2015." This succession of events arguably shows a lack of potential for rehabilitation: defendant's inability to *maintain* a useful and constructive place in society. Defendant's criminal record does not look like the record of a person who has much rehabilitative potential.

¶ 193      If someone keeps repeating serious drug offenses, even when out on bond for a drug offense, and if successive prison sentences make no evident lasting impression, this individual should not be surprised if eventually the hammer comes down hard. That is what happened in the present case. A reasonable mind could regard the maximum punishment of 30 years' imprisonment as commensurate with the sustained impunity of defendant's wrongdoing. Therefore, we find no abuse of discretion in the sentence. See *O'Neal*, 125 Ill. 2d at 297-98.

¶ 194                                    III. CONCLUSION

¶ 195      For the foregoing reasons, we affirm the circuit court's judgment.

¶ 196      Affirmed.